STATE OF IOWA v. FRANK DORLAND, Appellant.

**Intent in Manslaughter:** INTOXICATION: *Jury question.* Where it is the law of the case that conviction of manslaughter must depend upon whether defendant aided another in a deadly assault, the intent of defendant is so involved as that his being intoxicated bears upon the formation of such intent; and it is erroneous to

charge the jury that his intoxication does not affect his guilt or innocence of manslaughter.

**Province of Jury:** WEIGHT OF EVIDENCE. In an instruction as to the effect of intoxication on the guilt of a defendant charged with murder, it is error to state that there is some evidence tending to show that defendant was under the influence of intoxicating liquors, as the word "some" would be expressive of the opinion of the court as to the quantity and weight of the evidence of intoxication.

*Appeal from Fayette District Court.*—HON. L. E. FELLOWS, Judge.

TUESDAY, OCTOBER 12, 1897.

INDICTMENT for murder. Verdict of manslaughter. Judgment thereon, and the defendant appealed.— *Reversed.*

*Ainsworth & Ainsworth* and *W. E. Fuller* for appellant.

*Milton Remley,* attorney general, and *Jesse A. Miller* for the state

GRANGER, J.—I.    The indictment is for murder in the first degree against Frank Darland and Willie Smith. Separate trials were granted. On the eleventh of December, 1894, Dorland, Smith, one Bowser, and Andrew and Jacob Nelson started from West Union, in Fayette county, Iowa, in a wagon. It seems that Bowser owned and drove the team. Dorland, Bowser, and Andrew Nelson occupied a seat, with Dorland between the other two. Jacob Nelson and Smith stood up behind the others. They had some alcohol, and had been drinking. Some three miles from West Union, the men became involved in a quarrel, resulting in the death of Andrew Nelson. The circumstances

under which the party was found may be best under-
stood by part of the testimony of John Blunt, as fol-
lows: "I reside three miles and a half from town, east
of the Clermont road. I am a farmer. Reside over half
a mile from the scene of the trouble, south, and a little
east. Know defendant Dorland and Willie Smith. On
the eleventh of December last, I heard something
unusual on the Clermont road. It was a still evening,
and I heard loud talk over there. Could hear nothing
in particular, more than some curse words,—swearing.
Don't think anybody could tell what they were saying.
Told the boy to go and get the horse, and saddle him up.
Didn't hear this loud talk and swearing but a short
time. Would not think it was more than a minute or
two. Then I went into the house, got my coat, and told
the boy to get my horse. Then I went back into the
house, and then went on to the barn, got the horse, and
started over where the noise was. There is a road
across from my place to the Clermont road,—a track
where the milkmen drive. There is a gate at the
Clermont road. Went through that. It was east of
the scene of the alleged crime about twenty-five rods.
While at the fence, I hard some one say, 'For God's
sake, don't pound them any more!' I was then at the
gate on the south side of the road, twenty-five or thirty
rods from them, east of where the trouble occurred.
Came up within three or four rods of the boys. Heard
somebody say, 'Keep still, there is somebody coming;'
and then I think it was Smith or Frank said, 'That is
John Blunt,' or 'It is John Blunt's horse,' and they said
'Hallo!' and I answered them; and then they came out
where I was, and took hold of me. Both of them got
hold of me, and went on to tell me that they had had a
hell of a fight. They said they had had a hell of a
damned fight, and one of them had struck Willie, and
shot at him or 'shot at us.' They said they didn't know

whether the damned fools shot at them or shot in the air, and I asked them where the fellows were that they had the fight with, and they said, 'There the son of bitches are,—out there, on the ground.' We got along up to where Dave stood by the wagon, and they said they had taken the revolver away from them, and Dave had it in his pocket. From that I went out to where Andrew lay on the south side of the track, and asked him if he was hurt. He lay there with his head to the east and south, and his feet to the north,—in that direction (indicates); and the wagon was off in this direction, and I went to the one nearest the wagon, the same one I went to first, raised him up, and asked him if he was hurt. He didn't make any answer. Felt of his pulse, and thought from the way his pulse beat he was pretty near dead. He lay stretched out full length on his stomach and side. I went over to the other body. It lay on the north side, in almost the same direction and position, just about, on his left side; that is, on his stomach or side. Asked him the same question, and he didn't reply. Then went back to the boys, and told Dave we would have to do something with those boys; that they would chill out there on the ground. And Dave said he couldn't do anything; he couldn't leave his team. Told him he would have to unhitch them; we would have to get them up. Frank heard what I said, and said he would help put the boys in, and he did help put them in. Andrew was put in first. The boys were lying a rod or more apart; yes, more than a rod. One was further east than the other. There would be more than a rod's difference between the two from the wagon. We put Andrew in first. Put him in feet first. Frank and Mr. Shmuhl helped put him in, and I got in the wagon, to straighten him around, and to lay him down in the wagon. When I got him about half down, he made a struggle, raised up, made a struggle, and

kicked both feet right out over the wheel. The horses were started and backing. I helped him set up against the end gate like, and took his feet, and put them back into the wagon; then straightened him down in the wagon, and laid him out, and put something under his head, and laid him down there. As I was doing this, the other one laid over west a ways. The horses had started maybe four or five feet. Frank went and got hold of the other one, and lifted him up pretty near to the wagon. Then I got out, and we put him in head first. Frank helped put him in. I put a coat under the one's head we put in last; pulled him up and put a coat under his head. I told the boys to get ready and go. Frank said he wanted his overcoat; wanted to know where his overcoat was. Told him I didn't know; I put a coat under those Norwegians' heads. He went up and said 'that no lousy son of a bitch of a Norwegian could bleed on his coat,' and pulled it out. During this time Bowser was standing by the wagon, holding his team. Father drove up. The boys were talking with him, and I told them that they would have to go; that the boys were lying there in the wagon. When I came up, both of the boys came up. Smith and Dorland were bloody. Both were in their shirt sleeves. After father came up, Dorland wanted his hat. We went back, and found it about a rod or so west of the cottonwood tree. Think the cottonwood tree was about eight rods west of where the difficulty occurred, and on the north side of the road. After we got the bodies in the wagon, the boys got in, but, before they got in, Willie Smith called my attention to his coat. He wanted to show me how it was torn, and said that they tore his coat clear around, and he turned around and showed it to me. It was kind of a nappy coat. I didn't ride in the wagon when they started off. Willie got into the seat and Frank stood behind. Dave Bowser was in the seat. I followed behind them on horseback. They went on and ﴾

stopped at my father's, whose place was about eghty rods east from the alleged crime, and on the same road. Didn't stop at my father's very long. Hitched up a team (one of my horses and one of his) onto a lumber wagon, and went on to Mr. Howe's, where we got up with the boys. Mr. Howe's is about a half a mile from my father's and about three-quarters from the scene of the crime. Went on to Mr. Howe's, and, when I got there, they were standing around the wagon, and Mike Fritz asked me to get out and see what I thought about them. Got out and examined them. Went to Andrew first. He was lying in the hind end of the wagon. I told him he was dead. Then he looked at him, and felt of him, and told them he was dead, and Frank says, 'You don't say so.' And I said, 'Yes, he is dead.' And I turned around to the other one, with his head the other way. Looked at him, and Frank came around, and asked me how he was. I says, 'He is pretty near dead, too; and you will have to do something for them to keep them warm.' Frank said, 'They can have anything I have got;' they could have his coat. Took off his coat, and covered it over the dead body. Told him he didn't need to cover him up. 'Cover the other up, and keep him warm.' Don't know whether he made the change or not. Told Dave Bowser he better take them to his house, and take them in where it was warm, and I saw that somebody ought to go for the doctor. When Bowser spoke of taking them home, it was down to their shanty, and I told him it was better to take them to his own house, and then I left, and they went on. Think, when they went on, Smith and Dorland got into the wagon. Don't think any one else got in with them. I then came to town for the doctor, and got Dr. Ainsworth, and went down to the jail, and got Mr. Phillips." The testimony of the physicians who examined the body of Andrew Nelson shows that his body was considerably mutilated by cutting, and that one of the

wounds, under the arm, was fatal necessarily, and that death would result from such a wound in from three to five minutes. The testimony further shows that both Andrew and Jacob Nelson were severely bruised by beating. It is likely true that the cutting was done by a knife in the hands of Smith, and we gather from the record and arguments that whatever was done by Dorland was with his fists. The precise facts leading to and during the quarrel or fight, resulting in the death, cannot be known, because of the different versions of it by those present, and there were none other than those riding in the wagon that we have named. There is no dispute but that a fight was brought on in some way, and that both Nelsons, Smith and Dorland were engaged in it, with the results stated. The court gave instructions as to murder in both degrees and manslaughter.

Complaint is made of the nineteenth instruction, which is as follows: "(19) There is some evidence tending to show that the defendant, at the time of the commission of the alleged crime, was to some extent under the influence of intoxicating liquors. If, from the evidence, you find that the defendant was to any extent under the influence of intoxicating liquor, you are instructed that unless the intoxication of the defendant was, at the time of the commission of the act, so great as to deprive him of the power to deliberate and form a guilty intent, it is no excuse or palliation for the act. This question of intoxication can only be considered by you in determining whether or not the defendant is guilty of murder. It cannot affect the question of his being guilty of the crime of manslaughter, and it is entirely immaterial whether or not the deceased furnished the liquor drank by defendant." . Complaint is first made as to the words, "There is some evidence tending to show that the defendant, at the time of the commission of the alleged crime,

was to some extent under the influence of intoxicating liquors." The criticism is on the use of the word "some," and reliance is placed on our holding in *State v. Donovan*, 61 Iowa, 369. That was an indictment for an assault with intent to commit rape, and the court, in an instruction, said: "There is some evidence tending to show that the defendant was drunk." The instruction was held erroneous because of the word "some," in that "it would be understood as expressing the opinion of the court as to the quantity and weight of the evidence on the question of the defendant's drunkenness, which was unfavorable to him." In that case the drunkenness became material on the question of the defendant, at the time of the act, being in a condition of mind to be capable of forming the intent to do the unlawful act. The crime charged in the indictment in this case being murder, the intent in making the assault became material; and the instruction complained of was given to properly guide the jury on that branch of the case; and the court said to the jury that the intoxication of the defendant was proper to be considered in determining whether he had the mental capacity to deliberate and form a guilty intent. We cannot see why, in this case, the use of the word "some" is not equally fatal to the instruction on the question of murder that the use of the same word was in the *Donovan Case*, and for the same reason. But it is said that the cases differ; that in the *Donovan Case* the defense offered evidence to show intoxication, while in this case it did not, but only claimed that the entire party had been drinking to excess, and that the natural result would cause them to be intoxicated; and it is said that the defendants had been drinking, but were not drunk. The argument does not reach the difficulty. The court submitted the case to the jury on the theory of a state of evidence that the jury must

or might find it necessary to determine therefrom if Dorland was so intoxicated as to be incapable of forming a guilty intent. The court regarded, as we think it should, the question of intoxication as important on the question of murder. As this case and the *Donovan Case* involve precisely the same reasons for holding the use of the word "some" in the instructions erroneous, of course the same holding must follow.

II.   If, however, it may be said that on the question of murder there could be no prejudice to the defendant, because of the practical acquittal of the crime of murder by a verdict of manslaughter, we are brought to consider some complaints as to the instruction as bearing on the latter crime. Instruction No. 15 specifies the facts and conditions under which Dorland could be convicted of manslaughter. It is as follows: "(15) If you find from the evidence, beyond a reasonable doubt, that the defendant Dorland, in sudden passion or heat of blood, without premeditation and without malice towards Andrew Nelson, and without any specific intent to injure him, unlawfully assaulted and struck said Nelson violent blows, while said Nelson was being assaulted by his co-defendant, Smith, and for the purpose of assisting said Smith in his assault upon Nelson, and that neither Dorland nor Smith were acting in self-defense, and that the death of Nelson resulted from such assaults made by either or both defendants, then the defendant Dorland was guilty of the crime of manslaughter and you should find him guilty of that offense. If, however, the defendant Dorland took part in the affray for no other purpose than that of stopping the same, and did no more than was reasonable and proper under the circumstances to accomplish that purpose, then he was acting lawfully, and you should acquit him." It will be seen that the instruction only permits a verdict for manslaughter if Dorland, in doing

what he did towards causing the death of Nelson, did so
for the purpose of assisting Smith in his assault upon
Nelson; and, in view of the quite conclusive showing
that the death was caused by the knife cuts by Smith,
the theory of the instruction in this respect seems cor-
rect.   While the instruction as to intoxication, applied
to independent acts of persons charged with man-
slaughter, is correct, it is thought not to be so when the
acts constituting the offense involve an intent or pur-
pose, so that without that intent or purpose, the
crime cannot exist.   Because of this, it is urged
that the instruction, in the use of the word "some,"
is erroneous, and, besides, that it is erroneous
in holding that the fact of intoxication has no bearing
on the crime of manslaughter.   It seems to have
been the theory of the prosecution that, inas-
much as Smith's acts in using the knife took the
life of Nelson, Dorland's guilt must depend on his
having unlawfully aided in so doing, through a concert
of action; and the court adopted it to the extent of hold-
ing that there must have been an intent by Dorland to
aid Smith in his unlawful acts.   Now, if the state of the
record was such that the jury might consider the intox-
ication of Dorland in determining if he were capable of
forming an intent to kill, we do not see why it should
not be permitted to consider it in determining the fact,
submitted to it, of his having formed an intent or pur-
pose to help Smith in his unlawful acts.   Instruction
No. 16 seems to have reference to the guilt of the
defendant for any crime included in the indictment,
and it is as follows: "(16) The defendant in this case
is jointly indicted with another, one Willie Smith.   Evi-
dence has been introduced for the purpose of showing
the acts and conduct of both parties indicted, so as
to enable you to determine whether or not both these
parties were acting in concert and with a common intent

or otherwise. If, from the evidence, you find, beyond a reasonable doubt, that both the defendant Dorland and Smith were acting together, with a common purpose, aiding and assisting each other, and that, while so acting in concert, the life of the deceased was taken, it matters not which of the indicted persons inflicted the fatal injuries. The defendant would be guilty although he may not have inflicted the fatal wound himself, but the degree of his guilt would depend upon his own condition of mind as to the malice afore-thought, premeditation, deliberation, or the absence of any or all of these conditions of his mind." This instruction shows the theory on which a conviction must rest, and that the fact of Dorland and Smith aiding and assisting each other, with a common purpose, was important. In fact, there is no theory of the instructions on which a conviction could rest in the absence of an element of intent. It seems to us the court erred in saying that the fact of intoxication could not be considered in determining whether the defendant was guilty of manslaughter. There are no other questions that we regard it necessary to consider, in view of a new trial.—REVERSED.