STATE OF IOWA, Appellee, v. BROY HARDING, Appellant.

**INDICTMENT AND INFORMATION:** County Attorney Information—
1 **Filing Before Approval—Effect.** A county attorney information is not subject to a motion to set aside because the filing with the clerk momentarily *preceded* the formal indorsement of approval by the judge.

**CRIMINAL LAW:** Evidence—Confessions—Jury Question. Whether a
2 confession should be wholly rejected because improperly obtained is properly submitted to the jury when the only testimony which tends to show that the confession was not voluntary comes from the accused.

**CRIMINAL LAW:** Trial—Reception of Evidence—Preliminary Exami-
3 nation in re Confession. No error results from denying to an accused the right to examine, apart from the jury, the witnesses for the State as to the voluntary character of a confession when the entire record clearly presents a jury question on such issue.

**CRIMINAL LAW:** Accessories—Harmless Instructions. An accused
4 who is manifestly a principal, if guilty, is in no manner harmed by instructions to the effect that all accessories before the fact are principals.

**BURGLARY:** Evidence—Recent and Unexplained Possession of Bur-
5 glarized Property—Effect. The recent unexplained possession of

personal property which was, in the first instance, unquestionably obtained by someone in the commission of a burglary *may* justify the jury in finding that the possessor committed said burglary. (See Book of Anno., Vols. I, II, Secs. 13001, 13005.)

**CRIMINAL LAW: Instructions—Inferential Assumption of Fact Nega-**
6   **tived.** An inferential assumption of fact in instructions may manifestly be wholly negatived by other instructions.

**CRIMINAL LAW: Instructions—Flight or Attempted Escape—Effect.**
7   Flight or an attempt to escape is an indication of guilt, and the court may very properly so instruct. (See Book of Anno., Vol. 1, Sec. 13897, Anno. 105 *et seq.* See, also, Vol. II, under same section.)

**CRIMINAL LAW: Appeal and Error—Unargued Assignments—Effect.**
8   Unargued assignments of error on appeal will be deemed waived. (See Book of Anno., Vol. I, Sec. 12869, Anno. 81 *et seq.*)

**CRIMINAL LAW: Trial—Additional Witnesses—Scope of Testimony.**
9   Witnesses who testify for the State under a notice of additional testimony are not confined in their testimony to the matters and things specified in such notice. (See Book of Anno., Vol. I, Sec. 13851, Anno. 34.)

**CRIMINAL LAW: Trial—Argument—Failure to Testify—Permissible**
10  **Reference.** Principle recognized that the State may, in argument to the jury, very properly refer to the fact that a codefendant who was not on trial had not been called as a witness. (See Book of Anno., Vol. I, Sec. 13891, Anno. 22 *et seq.*)

Headnote 1: 31 C. J. p. 637 (Anno.) Headnote 2: 16 C. J. p. 927. Headnote 3: 16 C. J. p. 1003. Headnote 4: 17 C. J. p. 339. Headnote 5: 34 Cyc. p. 1806. Headnote 6: 16 C. J. p. 950. Headnote 7: 16 C. J. pp. 551, 985. Headnote 8: 17 C. J. p. 212. Headnote 9: 16 C. J. p. 800. Headnote 10: 16 C. J. p. 906.

Headnote 2: 53 L. R. A. 403; 8 R. C. L. 196. Headnote 5: 3 A. L. R. 1213; 12 L. R. A. (N. S.) 199; 4 R. C. L. 441. Headnote 7: 8 R. C. L. 192.

*Appeal from Harrison District Court.*—J. S. DEWELL, Judge.

DECEMBER 13, 1927.

A county attorney's information was filed against the defendant and his brother, David Harding, charging them with entering the premises of the Modale Savings Bank, with intent to rob said bank. The defendant, Broy Harding, entered a plea of not guilty, and was granted a separate trial. From a judg-

ment of conviction upon a verdict of guilty the defendant, Broy Harding, appeals.—*Affirmed.*

*William P. Welch,* for appellant.

*John Fletcher,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, *Roy Havens,* County Attorney, and *C. W. Kellogg,* for appellee.

WAGNER, J.—The record in this case is a revelation of one of the most daring holdups ever perpetrated within the confines of our state. About 9:30 A. M. on the 15th day of December, 1926, two bandits, well armed, entered the front door of the Modale Savings Bank. There were at that time behind the counter in the bank the cashier and another employee, and two citizens outside the railing. The bandits wore false mustaches, Scotch caps, and handkerchiefs around their necks, in such manner as by the use thereof they could cover the lower portion of their faces. As they entered the bank, with their revolvers drawn, there came from them such exclamations as "Stick 'em up." "No fooling." "We mean business." "We want your money." The cashier, Sassaman, replied, "No, no, you cannot have it;" and one of the bandits immediately shot him in the head, though not fatally, but the injury was sufficient to cause him to fall to the floor. The other employee of the bank started out of the back door; when one of the bandits shot at him; but the bullet passed over his head, and he escaped. The two bandits passed behind the counter, obtained possession of the gun there kept for the protection of the employees, and at the point of revolvers commanded the wounded cashier to open the safe, threatening to kill him if he refused. The cashier complied with their command. The bandits obtained money of various denominations in a sum in excess of $4,000, and then backed the cashier and others into the vault, and escaped out of the front door; shooting one Jackson in the leg as he passed along the street, and jumped into a Ford car, fully curtained,—except the right front curtain,—and made their escape. They went south a mile or a mile and a quarter, and then turned west. Two citizens pursued them to the corner, and where the bandits turned west, they turned east, and arrived at California Junction by a different route; and somewhere along the road they discovered

tracks that turned off into the brush near Blair Bridge, and, following the track for a mile and a half, they came to a shack. They saw a car pull away from the shack, going south. At the shack they found some empty cartridges and false mustaches. These two parties then went to a farmhouse and called the Modale authorities. They then returned to the shack and pursued the track down the river about three and one-half or four miles, where they found a car which had been burned, with a hole in the gasoline tank.

According to the record, this was the last seen of the bandits, or those thought to be the bandits, until that same afternoon, about 4 o'clock, when, at a house conducted by Mrs. Wilson, at 1713 California Street, Omaha, some of the police officers of Omaha and the sheriff of Pottawattamie County, Iowa, arrested the defendant and his brother, David Harding, who were suspected to be the bandits. It appears that the officers and the two Hardings arrived at this place about the same time. The Hardings came there in a taxicab, and shortly after they went into the house, the officers entered, and the defendant attempted to escape, but was captured. His brother, Dave, was pretty well intoxicated at the time, and started to scuffle with one of the officers, who pushed him against the frame of the door, and felt him for a gun; and a considerable sum of money was found on Dave's person at that time. The sum of $22 was found on the person of the defendant; and under the mattress on a bed in a room which the lady who conducted the house said, in the presence of the Hardings, was the room of the defendant and his brother, a large sum of money was found, a portion of which was identified as money taken from the Modale Savings Bank. The defendant and his brother were taken to the police station, and that evening the defendant made a confession, and the next morning, his brother, Dave, made a confession, and the defendant at that time signed a second confession.

It is shown by the record that Louise Hitchings, a witness for the State, was proprietress of a café in Missouri Valley, and that, while she was in the café on the evening of December 14th (the night before the robbery), she saw the defendant in her restaurant with another man, who put in a long distance call for 1960 Jackson, Omaha; and she heard the man ask over the telephone whether Mrs. Harding was there, and heard him also say:

"This is her husband calling. We are in Missouri Valley, and if all goes well, we will be home to-morrow." It is also shown by the record that a Ford car was stolen from the streets of Omaha on the evening of the 14th of December, and that the car hereinbefore mentioned as being burned at the river, on the morning of the 15th, bore the number plate of said car.

The first confession of the defendant hereinbefore referred to, which was obtained on the evening of December 15th, was signed by him, and was witnessed by the sheriff of Pottawattamie County and Harry H. Rubenstein, a reporter of the "Omaha Daily News," and several others. The second confession of the defendant was signed by him, and witnessed by William A. Gurnett (a police officer), Harry H. Rubenstein, as aforesaid, and two others. The voluntary character of the confessions is established by the testimony of Rubenstein, the police officers, and the sheriff. The confessions were by questions and answers. In the first confession, after stating his name, place of residence, age, and occupation, he was asked:

"I am going to ask you about the holdup of a bank at Modale, Iowa, which occurred about 9:30 A. M., December 15, 1926. You are aware that the Constitution of the United States and of the state of Nebraska, as well as the Constitution of the state of Iowa, among other things provides that you are not compelled to make any statement which might tend to incriminate you, and that anything that you say here may be used against you later. Now, knowing this, do you still wish to make a statement? A. I do."

He then answered questions, the answers to which we give in abstract form, as follows:

"I was not in Omaha this morning. Dave and I left here last night, and went down to that little house below the bridge near Blair, where we stayed all night. We left there about 8 o'clock this morning, and went straight to Modale. I went into the Modale Savings Bank, and Dave stayed out on the sidewalk. I stuck them fellows up, and got this money. I shot while I was in the bank, but not after coming out. We then went straight for the river. I set the car afire. I threw the gun that I used in the river. I had on a false mustache when I pulled this job. After setting the car on fire, I crossed the river to the Nebraska side. Dave was with me during all this time. We walked all

the way from Blair to Omaha. We stole a car last night at Sixteenth and Nicholas Streets. We then went to Missouri Valley, and then to the shack. We got back to Omaha just before we were arrested. Dave and I were together all the time. I gave all the money to Dave.

"Q. Do you make this statement of your own free will? A. Yes. Q. Is this statement the whole truth? A. Yes. Q. Have you been promised anything to make this statement? A. No."

In the second confession, obtained on the morning of December 16th, appeared the following:

"Q. Now, Mr. Harding, I want to ask you some questions about the theft of an automobile and the robbery of the Modale Savings Bank. Before I ask you any questions, however, I want to advise you that the laws of this state and the state of Iowa protect you against making any statement which might incriminate yourself, and you do not have to answer my questions or the questions of any other officer. I also want to warn you that anything you say to me can be used against you. Do you understand all of that? A. Yes, sir. Q. Well, knowing and understanding it, do you want to answer my questions? A. Yes, sir. Q. Did you read a statement made by your older brother in this office this morning? A. Yes, sir. Q. Did your brother David tell practically the truth in that statement? A. That is as near the truth as I could tell it. There might be some small mistake of memory, but that is about as close to the truth as anyone could tell it. Q. Well, just tell me from the start to finish how you happened to rob this bank. A. I knew about the bank at Modale, and I suggested to Dave that we rob it. Dave and I were both up against it for money, and had families. About two weeks ago, I went to Modale to look the job over, and I went into the bank and got a dollar's worth of dimes from the cashier. There were three men in the bank at that time, and it looked like the job could have been done without much danger. I told Dave what it looked like over there, and we decided to rob the bank. A few days ago, Dave got two pistols from a pawnshop in Omaha. He gave me a .45-caliber pistol. He had shells for the pistol also, and gave me them. On the night of December 14th, Dave and I went to Sixteenth and Nicholas Street and stole a Ford automobile from the street. The key was

right in the car, and I drove it away, with Dave in the seat with me. I drove the Douglas Street to Council Bluffs, and then to Missouri Valley, Iowa. I went into a hardware store there, to buy some shells, and the man didn't have the kind I wanted. Then we went into the restaurant, and got some coffee. Dave used the telephone in the restaurant and called somebody. From the restaurant we went to a little shack near the river below the bridge west of Missouri Valley. We built a fire in the shack, and stayed there all night. We had filled the tank with gasoline at some little town between Council Bluffs and Missouri Valley. While we stayed in the shack we left the Ford standing outside, near the shack. In the morning we drove to Modale, Iowa. Dave drove the car, and stopped on the street almost in front of the bank. I then got out of the car and went into the bank with my pistol in my hand, and Dave followed right in after me. I shouted, 'Stick 'em up, or I'll shoot.' When I went into the bank, the cashier would not stick up his hands, and I fired a shot at his head. I saw the blood stream from his head, and then I rushed in behind the counter. The cashier had fallen to the floor, and I saw that he wasn't seriously wounded, so I made him get up and open the vault. Then I took the money out of the vault. There was some gold and paper money,—something around three thousand dollars. I didn't count it, so I do not know exactly how much. There were two shots fired in the bank. I fired one at the cashier, and Dave fired another when one of the men started to run. Well, when I got the money, I rushed out into the street, and somebody fired a shot at me. Dave had already got up and got into the Ford. I jumped in the Ford car with Dave, and he drove toward the river. I put the money in the back seat of the Ford car. I heard some shots fired out in the streets near the front of the bank before I left the bank, but I do not know who fired them. Well, Dave drove straight west to the river. Dave took the money and kept it. When we got near the river bank, I fired a shot through the gasoline tank of the car, and then I lighted it. Dave and I had both worn false mustaches when we went into the bank. As the car started afire, we threw the false mustaches into the fire. Dave had bought those false mustaches about two weeks ago in Omaha at a mask store. Well, after

STATE V. HARDING. [204 Iowa

we started fire to the automobile, we walked across the river on the ice. Dave did away with the revolvers as we crossed the river. When we got over on the Nebraska side, we went over on the high road. An automobile came along, with a man, woman, and child in it. We asked the man for a ride, and he told us to get in. He drove us to Omaha, and we got out of his car up near the center of town. After we got out, we went to Dashnick's house, at Twenty-fourth and St. Mary's Avenue. Dave had the money in a sack when we got there, and we looked at it. There was around three thousand dollars there. Dave kept the money. Dave's father-in-law was at that house when we got there. He didn't see the money, and we didn't tell him anything about it. From that house I went to get shaved, and Dave went somewhere in a taxicab. Dave came back a couple of hours later. We stayed at that house for a while. Charlie Dashnick came home while we were there. Later on, Dave and I went out on the street and got a yellow cab. We then went to 1713 California Street. First we went to Stohler's place,—a fellow who used to buy fish from Dave. When we got to 1713 California Street, we went into a room. We heard the officers come in, and Dave threw the money under a mattress. The officers found the money, and took us to the police station. The money the officers found in that room with us was the same money I had taken from the vault in the Modale Savings Bank at Modale, Iowa. Q. Is there anything further that you want to say about this case? A. No, only that it is just as it is. I am sorry that it happened, and I am willing to take the punishment. I was in need of money, and that is the reason I went after it. Both of us wore handkerchiefs on our neck, which could be pulled up over the mouth. Q. Have you made this statement of your own free will? A. Yes, sir. Q. Have you been beaten or abused by anybody around here? A. No, sir. Q. Have you been threatened or put in fear by anybody around here? A. No, sir. Q. Have you been promised freedom from punishment for making a statement? A. No, sir. Q. Have you read the above statement? A. Yes, sir. Q. Are all the answers to my questions the truth? A. Yes, sir.''

The statements of fact in the confession of David Harding, which was introduced in evidence by the defendant, without

objection by the State, are in substantial accord with the statements made by the defendant in his confession.

The first contention of the defendant is that the court erred in overruling defendant's motion to dismiss the county attorney's information. It is not shown by the record that the grand jury was actually in session at the time of the filing of the county attorney's information. Under our statutory law, the county attorney may, at any time when the grand jury is not actually in session, file in the district court, either in term time or in vacation, an information charging a person with an indictable offense. Section 13645, Code of 1924.

1. INDICTMENT AND INFORMATION: county attorney information: filing before approval: effect.

It is provided in Section 13650 of the Code that:

"The information, before being filed, shall be presented to some judge of the district court of the county having jurisdiction of the offense, which judge shall indorse his approval or disapproval thereon. If the information receive the approval of the judge, the same shall be filed. If not approved, the charge shall be presented to the next grand jury for consideration."

It is provided by Section 13659 of the Code that a motion to set aside the information may be made on the ground, among others, that the information has not been filed and approved in the manner required.

It is shown by the record that the information in this case was filed by the county attorney in the clerk's office of Harrison County, at about 1:45 P. M. on January 4, 1927, and that, immediately after filing the same, he took it to the court room and presented it to Honorable J. S. Dewell, one of the judges of the district court, and that said judge immediately signed the written statement of approval on the back of the information. It thus appears that the information was actually filed an instant before its approval by the judge; but the two acts were, for all practical purposes, simultaneous, and had the same effect as if the county attorney had first presented it to the judge and obtained his approval, and then immediately filed it in the clerk's office. The apparent purpose of the legislature was to prevent the prosecution of a defendant by a county attorney's information without the approval of the court or judge; and if the county attorney's information

be on file, with the approval of the court or judge indorsed thereon, although the approval be actually indorsed thereon an instant after the filing thereof, the defendant could in no way be prejudiced. We find no merit in the defendant's contention.

The defendant predicates error upon the court's overruling his objections to the introduction in evidence of the two confessions hereinbefore mentioned. It appears that the brother,

2. CRIMINAL LAW: evidence: confessions: jury question.

David Harding, had at some time received injuries to his person, such as a broken nose, a broken rib, and discolorations on his back, and that, while in the Harrison County jail, he received medical attention on account thereof. How or when he received the injuries is in no manner disclosed, except by the defendant, who took the witness stand in his own behalf. He testifies that, upon their arrival at the police station, immediately after the arrest, Dave was taken into another room and beaten, and that he was held in the doorway where he could see him; that Dave was beaten by Buford and another man whose name he cannot mention; that Dave's head was held over a chair, and two men had a rubber hose, probably four feet long, and with both hands used the hose to beat him; and that they beat him from his shoulders to his knees, and there was blood on his shirt and blood on his underwear; that Danbaum, who appeared on the witness stand, did most of the kicking; that he saw his brother lying on the floor unconscious and unable to get up; and that they threatened him with the same treatment if he did not sign a statement, or something like that, admitting that he was in the Modale Bank robbery; that he would not have signed the first confession, had it not been for the treatment accorded to his brother in his presence; that they never said anything to him the next morning, before he signed the second confession; that his threatenings were all the night before; that, the next morning, Dave was taken into the same room and stripped off, before the confession was made; that he was not in Iowa on the 15th day of December, and was not at Modale, Iowa.

To set out all the testimony would indeed be lengthy. If the testimony of the sheriff, police officers, and newspaper reporter who witnessed the confessions be true, nothing by way

of abuse, threats, coercion, or putting of the defendant in fear occurred, as claimed by the defendant.

It is a significant fact that his brother, Dave, whom the defendant claims to have been injured so severely in the brutal manner as testified to by the defendant, was not used as a witness in his behalf. It is also significant that other news-paper reporters were present, and that the confessions were not obtained in privacy by members of the police department, but in the presence of newspaper reporters. The defendant's ver-sion of what occurred to his brother, Dave, which he claims influenced him to sign the confessions, is improbable.

As held by the lower court, it was for the jury, under proper instructions, to determine from the evidence whether the confessions were made voluntarily, and without having been induced by fear or threatened injury; and the jury were prop-erly instructed that, if they found from all the evidence that either one of said confessions was not voluntarily made, or that it was secured by threats or by being put in fear, or was in-duced by some promise of benefit to the said defendant, in case he made the same, then they should reject said confession, and give it no weight as against the defendant. The defendant places great reliance on *State v. Thomas,* 193 Iowa 1004; but there is no circumstance of similarity between the two cases, as shown by the record before us. In the above entitled case, it is said:

"* * * it is settled in this state that, where the free and voluntary character of the statements relied upon as a confession is the subject of *dispute or conflict* in the evidence, the question may properly be submitted to the jury. * * * If, however, it clearly appears from the record that the alleged confession was not freely and voluntarily made, or if the State, by its own evidence, negatives these essentials to its use in evi-dence, it is the duty of the court to sustain the objection and refuse its submission to the jury."

In the instant case, the only dispute or conflict in the evidence on this question is that made by the testimony of the defendant as a witness. It was clearly a question for the jury. This case is controlled by *State v. Storms,* 113 Iowa 385.

It is claimed by the defendant that the court erred in overruling his request to examine the witnesses for the State

upon the question of the voluntary character of the confes-
sions, without the presence of the jury; but
since their testimony shows that it was a ques-
tion for the jury, there is no ground for such
complaint. We have carefully scrutinized the
court's instructions upon the question of confessions, and the
court carefully, fully, and concisely gave the correct rules of
law applicable thereto.

3. CRIMINAL LAW: trial: reception of evidence: preliminary examination in re confession.

The defendant complains because the court gave an in-
struction based upon Section 12895 of the Code of 1924, as to
the acts of an accessory in aiding and abetting another in the
commission of a crime, it being the defendant's
contention that, under the record, the defendant
was a principal, and not an accessory. The
instruction was in no event prejudicial to the defendant. In
*State v. Burch,* 199 Iowa 221, it is said:

4. CRIMINAL LAW: accessories: harmless instructions.

"The evidence abundantly showed that the crime was com-
mitted jointly by appellant and DeBord. They both partici-
pated fully in its commission * * * they had also planned it
together; and the instruction submitting to the jury the ques-
tion of aiding and abetting in the commission of the crime
could not have been prejudicial."

The defendant complains because the court gave an in-
struction as to the identity of the defendant, as being one of
the parties who entered the Modale Savings Bank at the time
in question. This was one of the issues for the jury to deter-
mine, and the giving of the instruction was proper, and in no
way prejudicial to the defendant.

The defendant complains of instructions Nos. 10 and 11,
wherein the court instructed as to the law relative to the un-
explained possession of money obtained as a result of crime.
The jury were told that, if the evidence shows
beyond a reasonable doubt that the stolen goods,
or part thereof, were found in the possession
of the defendant, or in the possession of Dave
Harding, if they found from the evidence that they were acting
together in such matter, this would be sufficient, if this pos-
session is unexplained, to warrant them in finding that the
defendant was the man, or one of the men, who took the money
from the Modale Savings Bank. As to this there is no error.

5. BURGLARY: evidence: recent and unexplained possession of burglarized property: effect.

See *State v. Harris,* 194 Iowa 1304; *State v. Fortune,* 196 Iowa 995. In the *Harris* case we said:

"It is the rule in a prosecution for larceny that proof of defendant's possession of recently stolen property, where such possession is unexplained, constitutes sufficient prima-facia evidence to warrant the jury in finding the defendant guilty of larceny. It is also true that, where it appears that such larceny must have been committed in connection with a burglary or a robbery, then such unexplained possession is also sufficient prima-facie proof to warrant a conviction of burglary or robbery, as the case may be."

The court in said instructions said:

"Evidence has been offered by the State which it is claimed shows, not only that the Modale Savings Bank was, at the time in question, robbed of certain money, consisting of bills, gold, and silver dimes, and has also offered evidence showing, or tending to show, that some of the money so taken from the bank at the time in question was soon thereafter found in the possession of the defendant, Broy Harding, or in the possession of Broy Harding and Dave Harding, or in the possession of Dave Harding."

6. CRIMINAL LAW: instructions: inferential assumption of fact negatived.

It is the contention of the defendant that the record shows a conflict upon the question as to whether or not the money found in the possession of the Hardings was the money that was taken from the Modale Savings Bank, and that the court, by the use of the language "showing or tending to show," assumed the fact as proven, and thereby invaded the province of the jury. The court, however, left it for the jury to determine that question, by stating:

"In other words, if the evidence shows beyond a reasonable doubt that the stolen goods, or part thereof, were found in the possession of the defendant," etc.

Again quoting:

"In determining whether or not the money which was taken from Dave Harding, or that which was found in the possession of the defendant or in the possession of Dave Harding, by the officers in Omaha, Nebraska, was the money, or any part thereof, which had been taken from the Modale Sav-

ings Bank, you should carefully consider all the testimony relating to the identity of said money," etc.

Again quoting:

"And if you do so find that it is the same, or a part thereof, and further find that the defendant and Dave Harding were acting together in said matter, and if such possession, if shown, is unexplained," etc.

In *State v. Donovan,* 61 Iowa 369, the court had under consideration the following instruction: "* * * there is some evidence tending to show that defendant was drunk." The court held that without the qualifying word "some" the expression would have been free from objection. The court likewise so held in *State v. Dorland,* 103 Iowa 168. It is to be noted that the objectionable word "some" is not used by the court in the instant case.

It is apparent that the court inadvertently used the word "showing" in said instruction, and its use is unfortunate; but, in view of the remaining portions of the instructions hereinbefore quoted, it could not have been in any way prejudicial to the defendant. In *State v. Clark,* 180 Iowa 477, the court in one of the instructions said:

"In determining whether the defendant is guilty of the crime of rape, by reason of having carnally known and abused the said Iva Utley, and in having sexual intercourse with her, you are instructed that the State must establish, beyond a reasonable doubt, that the defendant, in having sexual intercourse with her, did penetrate the body of the said Iva Utley, in the act of sexual intercourse."

In passing upon this question we said:

"It is argued that there should have been added, 'if he did so have intercourse with her;' that without this, the court assumed for the jury 'that the defendant did carnally know and abuse the prosecutrix and did have sexual intercourse with her.' It is added that this matter was obviously for the jury to determine; that it must have been influenced 'by the manner' adopted by the court 'of referring in this instruction to the issue of carnal knowledge and intercourse;' and that it was needless for the court to refer to the matter in this way, and so doing was prejudicial. The jury was told time and again that the fact of whether there was intercourse was for

them. That being so, we have fully set out the matter complained of and the complaint made of it, because merely doing this will demonstrate that the complaint is not well made."

It thus becomes manifest that there was no prejudicial error. committed by the court at this point. Moreover, the defendant introduced in evidence the confession of David Harding, the brother of the defendant, which confession was received in evidence without objection by the State, and it is stated by David Harding therein:

"I threw the money under the mattress of the bed. Broy had handed me this money. I mean he put it in the back end of the automobile when we left Modale. It was the money that Broy had taken from the bank. I took the money out of the automobile before Broy burned the car near the river bank. We planned this robbery three or four days."

It can hardly be claimed that there was any conflict in the evidence as to this proposition.

The court instructed the jury that flight, or an attempt to escape from the officers of the law to avoid arrest, could be considered by the jury as an indication of guilt, and that the same might be considered in connection with all the other evidence in the case, to aid them in determining the guilt or innocence of the defendant. The defendant has no just cause for complaint as against this instruction. *State v. Heath,* 202 Iowa 153; *State v. Ralston,* 139 Iowa 44; *State v. Hetland,* 141 Iowa 524. The defendant relies on *State v. Poe,* 123 Iowa 118; but the court in the instant case did not instruct that flight would be presumptive evidence of guilt, which was the objectionable portion of the instruction in the *Poe* case.

7. CRIMINAL LAW: instructions: flight or attempted escape: effect.

The defendant, in his assignment of errors, claims that the court erred in its instruction relative to circumstantial evidence; but he fails to argue the same, and therefore has waived any ground of complaint that he might have as against said instruction. We have, however, scrutinized the instruction, and find no error therein.

8. CRIMINAL LAW: appeal and error: unargued assignments: effect.

The defendant requested the giving of ten instructions which have had our careful consideration. The thoughts therein expressed, or all that the defendant was entitled to, under

the record, were included in the instructions given by the court to the jury. The defendant has no ground for complaint with reference thereto.

The State served notice of the introduction of the testimony of one witness, as per Section 13851 of the Code of 1924. The statement of facts as to what the State expected to prove by the witness is quite fully set out; but the defendant complains because, over his objection, the witness was allowed to testify as to still other matters, not alleged in the notice. In this there was no error. *State v. Boomer,* 103 Iowa 106, wherein we said:

9. CRIMINAL LAW: trial: additional witnesses: scope of testimony.

"It has been held frequently that the examination of witnesses who testified before the grand jury need not be confined strictly to the matter set out in the minutes of the testimony * * * And the same rule is applicable to the examination of witnesses who were not before the grand jury, but testify on notice."

It is contended by the defendant that the county attorney for the State, in his opening argument, and Mr. Kellogg, attorney for the State, in his closing argument, were guilty of misconduct, in that some of their remarks were not substantiated by the record, and were prejudicial to the defendant. Time and space forbid the setting of it out in this lengthy opinion. One thing complained about by the defendant is that the county attorney referred to the fact that David Harding, the brother of the defendant, had not been called as a witness. We have heretofore in this opinion referred to the same as a significant fact. We have read all of the language which the defendant claims to be objectionable. The remarks of Mr. Kellogg were responsive to the argument as made by the defendant, and none of the language used by either of the attorneys for the State comes within the character of being inflammatory, and the contention of the defendant at this point is devoid of merit.

10. CRIMINAL LAW: trial: argument: failure to testify: permissible reference.

The defendant assigns as error numerous rulings of the court on the introduction of the exhibits, 29 in number, and on the rulings of the court on the introduction and exclusion of testimony. In some instances, the objection comes after the answer and no motion to exclude; in others there is a motion

to exclude, without any reason given.  We have considered the ruling in each specific instance, and the rulings complained of were correct, or in no manner or particular prejudicial to the defendant.

We have carefully considered every ground of error alleged by the defendant.  The defendant had a fair trial.  The jury has spoken.  .There is no prejudicial error in the record, and the judgment of the lower court is affirmed.—*Affirmed.*

EVANS, C. J., and DE GRAFF, ALBERT, and MORLING, JJ., concur.