STATE OF IOWA, appellee, v. TERRY LEE SIMS, appellant.

No. 47535.

(Reported in 40 N.W.2d 463)

642

JANUARY 10, 1950.

REHEARING DENIED MARCH 10, 1950.

McCormick & McCormick, of Sioux City, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, and Bernard A. Brown, County Attorney, for appellee.

MULRONEY, J.—The defendant appeals from his conviction of rape, and here asserts the main error was the trial court's admission of his written confession.

There was abundant testimony that on the evening of January 14, 1949, Norma Flynn, a sixteen-year-old girl, was raped. The attack occurred shortly after eight p.m. while Norma was walking from church to a home in Sioux City to keep a baby-sitting engagement. She made immediate complaint to her family and the police, to whom she gave the story and a description of her assailant, and she was examined by a doctor and taken to the hospital for further examination. She said her attacker was a Negro who had accosted her on a street corner and asked her where certain streets were located, and after she answered him he followed her and came up behind her and put his hand over her mouth and a knife in her side and marched her to a school playground near by where he attacked her. The officers made an investigation that night when the footprints of Norma and her assailant were still visible in the snow on the playground.

They took pictures of the footprints and noticed that the footprints of the attacker, made by galoshes, had distinguishing ridges and grooves.

On January 21, 1949, an officer in plain clothes who had examined the footprints was standing on a street corner about five p.m. when defendant, a Negro, walked past him. The officer noticed that the prints left in the snow by defendant's galoshes corresponded to the prints he had seen in the playground, so he followed him for a few blocks. The officer then stopped defendant, identified himself, and told defendant he would have to accompany him to the police station where he wanted to talk to him. The officer said defendant replied that "he was expecting it." The defendant accompanied the officer to the station, where his galoshes were removed and examined. Defendant's knife was found in one of the galoshes but he explained it had dropped out of his pocket. The defendant at first told conflicting stories as to where he had purchased the galoshes. Norma was brought to the police station and she identified defendant as the man who had raped her.

The officers questioned defendant until 1:30 or 2 o'clock in the morning. The officers testified that during the questioning he confessed to the crime about fifteen or twenty times and then he would retract and say he did not do it. At one point he told the officers his brother did it, so the officers brought his brother to the jail around 11:30, but when confronted by his brother he did not continue this accusation. The next day, January 22, defendant signed the confession, known as Exhibit H—the admission of which into the record is the first error asserted.

I. The exhibit which is largely in question-and-answer form occupies some ten pages of the printed record. It begins with the following paragraphs:

"I, Terry Lee Sims, make the following voluntary statement to Detective Sergeants A. E. Dik and A. A. Bucchino, in the presence of my wife, Marvelean Sims, and my brother Elix Sims, in the Detective Bureau, Sioux City, Iowa, this 22nd day of January, 1949. No threats nor promises have been made to me, and I know this statement will be used against me in court.

"This statement taken in question-and-answer form, ques-

tions being asked by Detective Sergeant A. E. Dik, and answers being given by Terry Lee Sims."

The exhibit then proceeds in question-and-answer form, the defendant stating in answer to interrogatories that his name was Terry Lee Sims; that he was twenty-five years old and lived at 710½ West Seventh Street with his wife and child. In his answers in the exhibit, Terry Sims stated that about eight o'clock in the evening of January 14, 1949, he raped a white girl. He gave a detailed description of his actions—how he first asked the girl the location of certain streets, his following the girl, and then his coming up behind the girl and placing his hand over her mouth and his knife in her side. He told of his marching the girl to the playground, and in shocking detail he told of the sexual attack, over the girl's protests. He did say in answer to one question that he knew there was no actual penetration. In answer to other questions Terry Lee Sims identified his galoshes and knife and said the galoshes were the ones he wore the night of January 14 and the knife was the knife he threatened the girl with. The exhibit closes with the following paragraph:

"This statement taken in shorthand by Gertrude B. Taggart, Secretary in the Detective Bureau, this 22nd day of January, 1949."

The exhibit bears defendant's signature on each of the eleven pages and the initials of two or three officers and Mrs. Taggart, who had taken the statement in shorthand and reduced it to its typewritten form.

The only objection made by defendant's counsel to the introduction of Exhibit H when it was offered was "that there is no showing that it is his [defendant's] statement other than his signature on each piece of paper." But the parties seemed to feel this raised the question as to the voluntary character of the confession, and the court reserved ruling at the time to grant defense counsel's request to permit him to cross-examine the police officer, then on the stand. Before such cross-examination the State went forward and introduced direct testimony that there were no promises or threats made to defendant; that he was not abused or beaten in any manner; and that the statement

after it was transcribed was read to defendant and he read it and he was asked if he wanted to change it in any manner and he replied that he did not. No evidence of threats, abuse or promises was brought out on the cross-examination of this officer. The defendant did not at that time offer any further evidence to show the confession was involuntary, so when defendant renewed his objection previously made the court ruled: "The exhibit will be admitted and will be instructed on."

The court was clearly right in this ruling. At the time it was made there was no evidence at all that the confession was involuntary. The admissibility of a confession is a question for the court to determine and the court must decide on the state of the record at the time he is called on to rule on the admissibility of the offered exhibit as to whether it was made freely and voluntarily and without compulsion or inducement. State v. Johnson, 241 Iowa 135, 138, 39 N.W.2d 123, 125, and cases there cited. In the Johnson case we also said if a substantial conflict arises as to the voluntary character of the confession "the question becomes one for the jury under proper instructions." Here the correctness of the instructions is not questioned.

As we read defendant's argument it is based on the rule announced in State v. Thomas, 193 Iowa 1004 at 1021, 188 N.W. 689, 696:

"If, however, it clearly appears from the record that the alleged confession was not freely and voluntarily made, or if the State, by its own evidence, negatives these essentials to its use in evidence, it is the duty of the court to sustain the objection and refuse its submission to the jury."

This rule was approved in State v. Harding, 204 Iowa 1135, 216 N.W. 642, and State v. Johnson, supra. The argument of defendant is that from this record it "clearly appears" the confession was not voluntarily made. But the only dispute or conflict in the evidence on the question of the voluntary character of the exhibit is that made by the testimony of the defendant as a witness. When he took the stand he testified he was beaten and struck by the officers frequently during the questioning the night he was arrested. He said the officers struck him with their fists on his face and head time and time again and

threatened him in order to make him confess. He said the officers' blows did not mark him up any and there is nothing in the record that he ever complained to his brother or wife that he had been beaten. Mrs. Taggart, testifying for the State, in rebuttal said defendant's wife and brother were present during the taking of the questions and answers in Exhibit H. Neither of them was called as a witness. Before making the confession he asked to see Buck Johnson, a Negro, described as a sort of "father-confessor" to colored people in Sioux City. The officers brought Buck Johnson to the station on January 22, and the State put him on the stand in rebuttal and he testified as to seeing the defendant and talking to him in the police station. He testified:

"Well, as far as I can remember he say he trail her from Thompson's Drug Shop up to Myrtle Street, when he get up there he claim that he grab her and put his left hand—place his left hand over her eyes and the knife in her side and tell her if she holler he would kill her. Q. Did he say what happened after that? A. Well, he admit to what he did. Q. I see. And did he tell you exactly what he did or did he just say, 'I did it'? A. No, I was sitting there listening at him, yes, I was sitting right there listening at him. Q. Did he go ahead and— A. What? Q. Did he go ahead and state what the things were he did? A. Yes, he explained what he did. Q. And do you want to repeat that to the jury, what it was, he said he did? A. I wouldn't care—I don't care to do that. He admit he did it. Q. Now, at that time did you talk to him about what, if any, kind of treatment had been accorded him there in the police station? A. Well, he didn't say that they had done nothing, they was all pretty lovely with him while I was there. I did talk to him. Mr. Yeaman came out and was talking with me about it, and Yeaman say the darndest case he ever saw in his life, he say, there wasn't none of them mad with him. I told him I might have plenty but I haven't got no money to put into it, which I haven't. Q. Now, could you determine whether or not he had any bruises on his face or about his head? A. Well, I was pretty close to him and it didn't seem to me there was a scratch on him. Q. Did he say anything about having been bruised? A. No, he didn't say nothing. Q. Did he say

he had been beaten? A. He didn't say nothing about that. Q. He didn't make any complaint to you about that at all? A. No, if he would I would know he did, if he had made any kind of complaint to me. He made no kind of complaint. Q. Did you ask him anything about that? A. No, all he said to me he wanted to get out. Q. He wanted out? A. He wanted out. Q. And you say he told you that everything was lovely as far as he was concerned, is the words he used? A. He didn't complain to me no way about nothing."

Quite clearly the question of the voluntary character of the exhibit was for the jury. There is no merit to defendant's first assignment of error.

II. In defendant's amended motion for new trial defendant complained that a defense witness, Jeannie Mae Brown, had committed perjury. This witness, a sixteen-year-old Negro girl, was the only witness, other than defendant, who testified for the defense. On her direct examination she testified as to a conversation she had with defendant about eight p.m. January 14, 1949, while she was waiting for a bus. This meeting with Jeannie Mae was also described by defendant in his confession, Exhibit H. The officers left a note at her home asking her to come to the police station, and there she made a statement to the police. In defendant's statement in Exhibit H he said she asked him for a dime for bus fare and that he gave it to her. In Jeannie Mae's statement to the police she corroborated the defendant but went on to say defendant got "fresh" with her and made statements indicating he wanted to have sexual intercourse with her. In her direct examination she testified as to her telling the police defendant got "fresh" with her and in her cross-examination she also told the conversation she had with defendant indicating a proposition for sexual intercourse with her. Her statement to the police which was in writing and signed by her (Exhibit J) was introduced in evidence without objection. Attached to the amended motion for new trial was the affidavit of Jeannie Mae Brown to the effect that any statement in Exhibit J or any statement to the police or any testimony she gave with reference to defendant getting fresh with her or with reference to defendant conversing with her so as to make her believe "he had immoral intentions" were all untrue.

■ There is no merit to defendant's contention that he should have been granted a new trial on the ground that Jeannie Mae committed perjury. See Weinhart v. Smith, 211 Iowa 242, 233 N.W. 26, and cases there cited. While we have held that a court may in his discretion allow a new trial where the prevailing party perjured himself or knowingly used perjured testimony, still this case does not even come within that rule. Jeannie Mae's testimony was offered by defendant. The State offered Exhibit J, her statement, to the police, but she made the same statements contained in the exhibit on the witness stand in cross-examination.

■ III. The second ground of the amended motion for new trial was that defendant's wife had not been called as a witness. Attached to the motion was the affidavit of defendant's wife to the effect that at the trial she had offered herself as a witness to the attorney then representing her husband (not the same counsel who represented defendant at the time of the motion or on this appeal) and she advised the attorney of the material testimony she would give, but the attorney told her the county attorney would not allow her to testify and if she did testify the county attorney would get her "all crossed up." The court committed no error by denying the motion on the above ground. The complaint presents only a difference of opinion between trial and appeal counsel as to whether the defendant's wife would have been a good witness for defendant.

■ ■ IV. The last ground of the amended motion for new trial was that there was evidence relating to the defense of alibi that had been discovered since the trial. Attached to the motion was the affidavit of Lottie Poole who lived at 710¾ West Seventh Street (defendant's home was 710½ West Seventh Street) to the effect that she saw defendant at his home at 8:15 on the porch and she talked with him for about ten minutes.

The motion for new trial on the ground of newly discovered evidence goes to the statutory ground of whether there was a fair and impartial trial. State v. Burgess, 237 Iowa 162, 21 N.W.2d 309. There was no showing of defendant's inability to present Lottie Poole's testimony at the time of trial except the statement in the motion that this evidence "has been discovered since the time of trial." She lived but a door or two away from

defendant and it would seem but little inquiry would have disclosed this testimony. At any rate, the showing on this ground is inadequate to establish an abuse of the trial court's discretion in overruling the motion.

■ V. The last error asserted is that there was not sufficient corroboration of Norma Flynn tending to connect the defendant with the commission of the offense, as required by section 782.4, Code, 1946. Defendant argues the evidence of the galoshes was the only evidence which tended to connect the defendant with the offense other than the testimony of Norma. But defendant's entire argument is based on the exclusion of Exhibit H, his confession. Since we hold this admissible we can dispose of this assignment by holding the required corroboration can be found in his confession and in other testimony of admissions of the defendant. State v. Banks, 227 Iowa 1208, 290 N.W. 534.

Finding no error the judgment is affirmed.—Affirmed.

BLISS, C. J., and OLIVER, HALE, WENNERSTRUM, SMITH, MANTZ, and HAYS, JJ., concur.

GARFIELD, J., concurs except insofar as State v. Johnson, 241 Iowa 135, 39 N.W.2d 123, is cited with approval.