# IN THE SUPREME COURT OF IOWA

No. 07–0352

Filed October 2, 2009

**STATE OF IOWA,**

Appellee,

vs.

**JORDAN KEVIN LAMAR BRUEGGER,**

Appellant.

_____

Appeal from the Iowa District Court for Sioux County, James D. Scott, Judge.

Defendant appeals sentence for statutory rape as violating federal and state prohibitions against cruel and unusual punishment. **SENTENCE VACATED AND CASE REMANDED WITH DIRECTIONS.**

Matthew R. Metzgar and R. Scott Rhinehart of Rhinehart Law, P.C., Sioux City, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, and Coleman McAllister, County Attorney, for appellee.

**APPEL, Justice.**

In this case, we are confronted with a claim by a defendant convicted of statutory rape that a twenty-five-year prison sentence amounts to cruel and unusual punishment. His term of incarceration was substantially lengthened based upon a prior incident of sexual misconduct committed by the defendant as a juvenile. For the reasons expressed below, we vacate the sentencing order of the district court and remand for further proceedings.

## I. Background Facts and Prior Proceedings.

According to the victim, K.B., she engaged in a sexual relationship with the then twenty-one-year-old defendant, Jordan Bruegger, shortly after her fifteenth birthday. K.B. considered Bruegger to be her boyfriend and believed she was in love with him.

On January 29, 2006, K.B. and a friend were driving around Hudson, South Dakota. Bruegger joined them in the auto cruising, but eventually left the minors to go to a local bar. K.B. returned home without Bruegger.

At two or three o'clock the next morning, an intoxicated Bruegger drove his truck to K.B.'s home, appeared at K.B.'s window, and woke her. K.B. agreed to leave with Bruegger. Eventually, K.B. and Bruegger drove into Iowa and arrived at a gravel pit in Sioux County owned by Bruegger's family. Bruegger drove the truck off-road, resulting in the vehicle becoming stuck in the mud. K.B. and Bruegger exited the mired vehicle and attempted to walk toward a trailer at the entrance to the gravel pit, but it was too dark and the pair returned to the truck.

After talking for a while, the two had sexual intercourse in the vehicle. They then fell asleep in the truck. After being awoken by the defendant's father later that morning, K.B. and Bruegger walked to the

trailer, which was unlocked and unoccupied. Once in the trailer, K.B. and Bruegger engaged in sexual intercourse on a couch and again fell asleep.

On February 14, Bruegger was arrested by Iowa authorities. He was charged with sexual abuse in the third degree upon Jane Doe, being fifteen years of age, and Bruegger, being five or more years older under Iowa Code section 709.4(2)(*c*)(4) (2005). The crime involved—consensual sexual intercourse with an underage teenager—is commonly referred to as statutory rape.

On November 22, the State moved to amend its trial information to include a second count of statutory rape stemming from the second act of intercourse occurring in the trailer.

One week later, the State filed a request for a preliminary ruling, stating that it intended to use Bruegger's Faribault County, Minnesota "conviction" for the crime of sexual conduct in the first-degree to enhance Bruegger's sentence under Iowa Code section 901A.2(3). Iowa's sentence enhancement statute relating to sexual offenders provides that "a person convicted of a sexually predatory offense which is a felony," including statutory rape, will receive an enhanced, mandatory sentence of twenty-five years, with the person's sentence reduced by a maximum of fifteen percent, if the offender has a prior conviction of a sexually predatory offense. Iowa Code §§ 901A.1, .2(3).

A person who commits the crime of statutory rape as a first offender is subject to a prison sentence of up to ten years, with a reduction for various good time and earned credits. *Id.* §§ 709.4(2)(*c*)(4), 902.9(4). The district court also retains discretion to sentence the offender to less than ten years incarceration, and the offender would likely be eligible for parole well in advance of the expiration of any

sentence imposed. A person convicted of a sexually predatory offense who is subject to sentence enhancement because of a prior sexually predatory offense, however, is subject to a much harsher mandatory prison term of twenty-five years, without the possibility of parole for approximately 21.25 years.

The conviction which the State intended to use to enhance Bruegger's sentence occurred when Bruegger was twelve years old. Under Iowa Code section 901A.1(2), the term "prior conviction" includes an "adjudication of delinquency." The term "sexually predatory offense" further includes sexual offenses which, if committed in another jurisdiction, would constitute an equivalent offense to those covered under Iowa law. *Id.* § 901A.1(*f*). Bruegger does not contest that the Minnesota adjudication qualified as a prior sexually predatory offense for purposes of Iowa's sexual predator sentencing statute.

On January 10, 2007, the State filed a motion to amend the trial information to add the sentencing enhancement based upon Bruegger's juvenile adjudication in Minnesota. On the morning of trial, the State filed another motion to amend that was nearly identical. Bruegger did not resist the enhancement amendment, which the court orally allowed prior to trial.

On January 12, the jury found Bruegger guilty of sexual abuse in the third degree as to count one (the incident in the truck), but not guilty as to count two (the incident in the trailer). After the verdict was rendered, Bruegger admitted to the Minnesota juvenile adjudication. As a result of the admission, a bifurcated trial on the enhancement was not necessary, and the jury was excused. Later that afternoon, the State filed a supplemental trial information. This trial information made no reference to Bruegger's juvenile adjudication.

On February 12, the parties filed documents with the district court prior to sentencing. The State filed a Minnesota court order authorizing the release of Bruegger's juvenile records with appropriate redactions, the original petition filed in Minnesota on March 13, 1997, alleging that Bruegger was delinquent under Minnesota law, a disposition order dated September 26, 1997, adjudicating Bruegger as a delinquent, and copies of Minnesota law relating to sexual misconduct.

In the petition filed with the Minnesota juvenile court, Minnesota authorities alleged that Bruegger committed two counts of criminal sexual conduct in the first-degree between October and November 1996. The first count alleged that Bruegger engaged in sexual penetration of another who was under the age of thirteen when Bruegger was more than thirty-six months older than the other person. The second count alleged that Bruegger engaged in sexual penetration of another with a person under the age of thirteen when Bruegger had a significant relationship with that person. The petition further alleged that Bruegger admitted incidents of sexual touching and oral sex with the other person. The other person allegedly stated that Bruegger laid on top of her and rubbed his penis against her private area over her panties. The misconduct occurred while Bruegger was babysitting a younger child.

The dispositional order revealed that Bruegger was adjudicated a delinquent, placed in the custody of the Faribault County Human Services, placed in a therapeutic foster home with a social service agency, and placed on indefinite probation on the condition that he successfully complete a social awareness program and any aftercare recommendations.

Bruegger filed three documents with the court. These documents included a statement from his daughter's mother that he is a loving

father, did not drink, and was a good role model, a statement from his stepfather that he was a hard worker and good father, and a letter from his mother offering her perspective on the prior juvenile adjudication and describing the suffering her family endured after Bruegger's arrest.

None of these filings mattered under Iowa law. The district court sentenced Bruegger, as required by statute, to twenty-five years incarceration, with a mandatory minimum of eighty-five percent, a suspended fine of $1000, a civil penalty of $200, a special sentence committing him to the custody of the Director of the Iowa Department of Corrections for the remainder of his life, an additional term of parole or work release not to exceed two years, supervised electronic tracking, and submission of a DNA sample.

After imposing sentence, the court noted:

> In reaching this sentencing decision, the court is following the mandates of the Iowa legislature. Our legislature has chosen to focus on sexual offenses and, I believe, in this case has produced a very harsh result. I have taken an oath to uphold the Constitution of the United States and the State of Iowa. And unless I find the statute is unconstitutional, it's my duty to enforce that statute, and that's what I'm required to do in this case. In my opinion this statute is not unconstitutional. However, I think it produces an unintended result of an unfairly harsh punishment for this crime of consensual sexual contact between the defendant and the victim.

Bruegger filed a timely notice of appeal. On appeal, he claims that use of his prior juvenile adjudication to enhance his sentence for statutory rape was in error as: (1) the court lacked jurisdiction to consider the enhancement, (2) the sentence enhancement constituted cruel and unusual punishment, and (3) the court failed to adequately inform him of the consequences of admitting to the prior adjudication.

## II. Standard of Review.

A challenge to the trial court's jurisdiction is reviewed for correction of errors at law. *State v. Oetken*, 613 N.W.2d 679, 686 (Iowa 2000). A defendant may challenge an illegal sentence at any time. *State v. Parker*, 747 N.W.2d 196, 212 (Iowa 2008). This court reviews constitutional questions de novo. *State v. Brooks*, 760 N.W.2d 197, 204 (Iowa 2009).

## III. Challenge to Subject Matter Jurisdiction.

Bruegger asserts that the district court lacked subject matter jurisdiction to enhance his sentence. Bruegger admits that the State, in documents filed on January 10 and 11, sought to amend the information to allege that his offense of sexual abuse in the third degree was a second offense for purposes of Iowa Code chapter 901A. Bruegger asserts, however, the controlling document in this case is an additional supplemental information filed by the State on January 12. This final document contained no mention of the enhancement or Iowa Code chapter 901A.

According to Bruegger, the supplemental filing controls in this case, and because it lacks reference to the enhancement, the district court was without authority to impose the enhancement. Bruegger relies upon *State v. Thacker*, No. 05AP-834, 2006 WL 1826079 (Ohio Ct. App. June 30, 2006), in support of his argument. In *Thacker*, an appellate court held that the trial court erred by finding the defendant a violent sexual offender at sentencing when no such specification appeared in the indictment. *Thacker*, No. 05AP-834, 2006 WL 1826079, at *2.

The State counters that this case is controlled by *Oetken*. In *Oetken*, the defendant claimed that the State filed a substituted and supplemental trial information that did not mention his purported status

as an habitual offender, thereby depriving the court of jurisdiction to sentence him as a habitual offender. *Oetken*, 613 N.W.2d at 686. This court held that the substituted and supplemental trial information was filed to comply with Iowa Rule of Criminal Procedure 6(5), which provides that a " 'supplemental indictment shall be prepared for the purpose of trial of the facts of the current offense only' " in cases where a prior conviction will be used for enhancement purposes. *Id.* at 687 (quoting Iowa R. Crim. P. 6(5) (now rule 2.6(5))). Failure of the supplemental information to note the enhancement thus did not deprive the court of jurisdiction over the enhancement. *Id.*

Bruegger responds that under *Oetken*, the State must first file a trial information alleging the previous crime that is the basis for enhancement and only then may file a supplemental trial information. Bruegger argues that because the file does not contain a file-stamped copy of an amended trial information, the holding in *Oetken* does not apply.

We disagree. The record shows that on November 28 the State requested a preliminary ruling on the issue of the sentencing enhancement and outlined the facts related to the Minnesota juvenile offense. Bruegger thus had sufficient notice of the State's intent to add the sentencing enhancement.

While it is true that the record contains no file-stamped copy of any version of the second-amended-and-substituted trial information, the district court at a hearing on January 12 stated that the State's second motion to amend the trial information, together with its proposed supplemental information, was before the court. When asked if he wished to be heard on the matter, Bruegger's counsel stated, "No, Your Honor. I think that this complies with the law. . . . I don't have any

objection to it." The court then stated that the second amended trial information simply alleged a prior conviction and a sentencing enhancement, that the State gave the defendant notice of its intention in November, and that there is no unfair surprise or prejudice by the motion. As a result, the district court sustained the motion to amend orally.

In light of these facts, Bruegger's claim, stripped to its essentials, is that the failure of the State to file copies of the second-amended-and-substituted trial information after the hearing prevents this court from relying upon them in any way. We reject this assertion. In a number of contexts, we have held that technical irregularities in the development of the record do not require reversal if the record clearly shows what transpired at trial and there was no prejudice to the defendant. *See State v. Sheffey*, 234 N.W.2d 92, 95 (Iowa 1975) (holding information may be amended by order of court before or during trial to correct errors of form or substance); *State v. Harding*, 204 Iowa 1135, 1143–44, 216 N.W. 642, 646 (1927) (holding that information filed shortly before its approval by district judge has same effect as if it had been approved and then filed); *State v. Japone*, 202 Iowa 450, 455, 209 N.W. 468, 471 (1926) (holding that failure to make amendment after leave was not prejudicial error, where trial was conducted as if amendment had been made).

Under the circumstances presented here, we conclude that the technical failure of the State to file an approved second-amended-and-substituted trial information, where the motion to amend was not resisted by the defendant and which was sustained by the district court, does not defeat subject matter jurisdiction in this case. We further hold, as in *Oetken*, that the supplemental information was simply designed to

comply with Iowa Rule of Criminal Procedure 2.6(5) and does not provide Bruegger with grounds for relief.

### IV. Threshold Question of Issue Preservation.

Bruegger did not claim that his sentence violated the prohibition against cruel and unusual punishment in the proceedings below. On appeal, he argues that he may raise the issue for the first time for two reasons. First, he asserts that his sentence is unconstitutional, as it inflicts cruel and unusual punishment, and thus amounts to an illegal sentence that can be challenged at any time. Second, he asserts that the failure of his trial counsel to raise the constitutional issue amounts to ineffective assistance of counsel. Neither of these claims is subject to traditional preservation of error or waiver constraints.

We first address the issue of whether Bruegger's challenge to his sentence as cruel and unusual punishment amounts to an attack on an illegal sentence.[1] There is substantial authority in other jurisdictions for

---

[1]Bruegger did not claim either below or on appeal that the use of his juvenile adjudication to enhance his sentence constitutes an illegal sentence because it violates due process. There is a split in the courts regarding whether juvenile adjudications may be utilized as sentence enhancements in criminal cases in light of the United States Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and its progeny. *Compare United States v. Tighe*, 266 F.3d 1187, 1194 (9th Cir. 2001) (holding the use of juvenile adjudications without right to jury trial violates due process of law under *Apprendi*), *and State v. Brown*, 879 So. 2d 1276, 1290 (La. 2004) (same), *with United States v. Burge*, 407 F.3d 1183, 1191 (11th Cir. 2005), *United States v. Jones,* 332 F.3d 688, 696 (3d Cir. 2003), *and United States v. Smalley*, 294 F.3d 1030, 1033 (8th Cir. 2002). There is also a substantial body of literature which questions, on due process grounds, whether juvenile court adjudications may be considered the same as criminal convictions for purposes of sentence enhancement statutes. Generally, the critics note: (1) the different purposes of a juvenile adjudication and the juvenile justice system as a whole, (2) the prevalence of pleas in the juvenile system, (3) the lack of a jury trial in most juvenile proceedings, (4) the difficulty of juveniles to meaningfully participate in a process they do not fully understand and do not control, and (5) the lack of incentives to thoroughly litigate in juvenile proceedings. *See, e.g.,* Courtney P. Fain, Note, *What's in a Name? The Worrisome Interchange of Juvenile "Adjudications" with Criminal "Convictions,"* 49 B.C. L. Rev. 495 (2008); Alissa Malzmann, Note, *Juvenile Strikes: Unconstitutional Under* Apprendi *and* Blakely *and Incompatible with the Rehabilitative Ideal*, 15 S. Cal. Rev. L. & Women's Stud. 171 (2005); Brian P. Thill, Comment, *Prior "Convictions" Under*

such a proposition. *See Defoe v. State*, 750 A.2d 1200, 1201 (Del. Super. Ct. 2000) (finding a sentence that violates the Double Jeopardy Clause illegal); *State v. Kido*, 654 P.2d 1351, 1356 (Haw. Ct. App. 1982) (considering a cruel and unusual sentence to be illegal); *Randall Book Corp. v. State*, 558 A.2d 715, 719 (Md. 1989) (same); *Brown v. State*, 99 P.3d 489, 491 (Wyo. 2004) (finding challenge to illegal sentence to include challenges that the sentence is unconstitutional). *But see State v. Spriggs*, 754 So. 2d 84, 84 (Fla. Dist. Ct. App. 2000) (finding motion to correct an illegal sentence not proper vehicle for bringing a cruel-and-unusual-punishment claim); *Trevino v. State*, 174 S.W.3d 925, 927–28 (Tex. Ct. App. 2005) (same).

We, however, have not taken this approach. In *State v. Ramirez*, 597 N.W.2d 795, 797 (Iowa 1999), the defendant claimed that he was not required to preserve error on a claim that his sentence constituted cruel and unusual punishment. We rejected the argument, holding that the proper avenue for considering the alleged error was through an ineffective-assistance-of-counsel claim. *Id.* Similarly, in *State v. Ceaser*, 585 N.W.2d 192, 195 (Iowa 1998), we held a claim that a sentence was illegal because it violated equal protection did not amount to an illegal sentence and was governed by our normal error preservation rules.

We conclude the better view is that a challenge to an illegal sentence includes claims that the court lacked the power to impose the sentence or that the sentence itself is somehow inherently legally flawed, including claims that the sentence is outside the statutory bounds or

---

Apprendi*: Why Juvenile Adjudications May Not be Used to Increase an Offender's Sentence Exposure if They Have Not First Been Proven to a Jury Beyond a Reasonable Doubt*, 87 Marq. L. Rev. 573 (2004); Barry C. Feld, *The Constitutional Tension Between* Apprendi *and* McKeiver*: Sentence Enhancements Based on Delinquency Convictions and the Quality of Justice in Juvenile Courts*, 38 Wake Forest L. Rev. 1111 (2003).

that the sentence itself is unconstitutional. This conclusion does not mean that any constitutional claim converts a sentence to an illegal sentence. For example, claims under the Fourth, Fifth and Sixth Amendments ordinarily do not involve the inherent power of the court to impose a particular sentence. Nor does this rule allow litigants to reassert or raise for the first time constitutional challenges to their underlying conviction.

We further find that this course is consistent with interpretations of the comparable federal rule. Our Rule of Criminal Procedure 2.24(5)(*a*), formerly rule 23(5)(*a*), which allows a defendant to challenge an illegal sentence at any time is based on the pre-1966 federal rule. *Tindell v. State,* 629 N.W.2d 357, 359 (Iowa 2001). As the United States Supreme Court made clear, under the federal rule the purpose of allowing review of an illegal sentence is "to permit correction at any time of an illegal *sentence,* not to re-examine errors occurring at the trial or other proceedings prior to the imposition of the sentence." *Hill v. United States,* 368 U.S. 424, 430, 82 S. Ct. 468, 472, 7 L. Ed. 2d 417, 422 (1962). The Supreme Court went on to note that challenges to an illegal sentence include whether

> [t]he punishment meted out was . . . in excess of that prescribed by the relevant statutes, multiple terms were . . . imposed for the same offense, . . . [or] the terms of the sentence itself [were] legally or *constitutionally invalid* in any other respect.

*Id.* (emphasis added).

Where, as here, the claim is that the sentence itself is inherently illegal, whether based on constitution or statute, we believe the claim may be brought at any time. To the extent our cases stand for a contrary proposition, they are overruled. Because we find Bruegger's claim a

challenge to an illegal sentence we will address it directly and not under the guise of an ineffective-assistance-of-counsel claim.[2]

**V. Cruel and Unusual Punishment Under the United States Constitution.**

**A. United States Supreme Court Framework.**

1. *General approach.* The United States Constitution prohibits the imposition of "cruel and unusual" punishment. U.S. Const. amend. VIII. The clause embraces a bedrock rule of law that punishment should fit the crime. This basic concept stands for the proposition that even guilty people are entitled to protection from overreaching punishment meted out by the state. The United States Supreme Court has struggled with the proper approach to "cruel and unusual" punishment. In recent years, the cases of the Supreme Court have produced a multitude of majority, plurality, and dissenting opinions.

Nonetheless, there are some principles that can be distilled from these opinions. Although some have argued that the Cruel and Unusual Punishment Clause is designed to address only *methods* of punishment, the Supreme Court has firmly held that the Cruel and Unusual Punishment Clause applies to a sentence for a term of years. *Lockyer v.*

---

[2]We note that Bruegger raises an additional claim of ineffective assistance of counsel, namely that trial counsel was ineffective for not requiring the court to conduct a colloquy ensuring that Bruegger knowingly and voluntarily stipulated to his prior adjudication. The significance of stipulating to a prior felony conviction for recidivist sentencing purposes applies equally to stipulations of juvenile adjudications used for enhanced sentencing. In *Oetken*, we acknowledged that " 'defendant's admission of prior felony convictions which provide the predicate for sentencing as an habitual offender is so closely analogous to a guilty plea that it is appropriate to refer to our rules governing guilty pleas . . . .' " *Oetken*, 613 N.W.2d at 687 (quoting *State v. Brady*, 442 N.W.2d 57, 58 (Iowa 1989)). Under the current record, however, we are unable to dispose of this ineffective-assistance-of-counsel claim. There is nothing in this record to indicate whether or not Bruegger's counsel adequately informed him of the consequences of his stipulation. "Such evidence could be a significant part of our prejudice analysis." *State v. Straw*, 709 N.W.2d 128, 138 (Iowa 2006). This claim is thus reserved for postconviction relief.

*Andrade*, 538 U.S. 63, 73, 123 S. Ct. 1166, 1173, 155 L. Ed. 2d 144, 156 (2003); *Ewing v. California*, 538 U.S. 11, 20, 123 S. Ct. 1179, 1185, 155 L. Ed. 2d 108, 117 (2003). Thus, a reviewing court has the authority to consider whether imprisonment for a term of years for a particular crime or crimes is so excessive as to violate the Cruel and Unusual Punishment Clause.

The Supreme Court has also emphasized that legislative determinations of punishment are entitled to great deference. In order to establish a claim for cruel and unusual punishment, a sentence must be "grossly disproportionate" to the underlying crime. *Rummel v. Estelle*, 445 U.S. 263, 271, 100 S. Ct. 1133, 1138, 63 L. Ed. 2d 382, 389 (1980). As Justice Rehnquist suggested, a life sentence for a parking ticket could run afoul of cruel and unusual punishment as being grossly disproportionate to the crime. *Id.* at 274 n.11, 100 S. Ct. at 1139 n.11, 63 L. Ed. 2d at 391 n.11. Strict proportionality in sentencing, however, is not required, and a reviewing court is not authorized to generally blue pencil criminal sentences to advance judicial perceptions of fairness. "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Harmelin v. Michigan*, 501 U.S. 957, 994–95, 111 S. Ct. 2680, 2701, 115 L. Ed. 2d 836, 864 (1991). While a sentence to a term of years might be so lengthy as to violate the Cruel and Unusual Punishment Clause, such an occurrence outside the context of capital punishment has been "exceedingly rare." *Rummel*, 445 U.S. at 272, 100 S. Ct. at 1138, 63 L. Ed. 2d at 390.

In evaluating whether a lengthy sentence is "grossly disproportionate" under the Cruel and Unusual Punishment Clause, the Supreme Court has developed a three-part test. *Solem v. Helm*, 463 U.S.

277, 292, 103 S. Ct. 3001, 3011, 77 L. Ed. 2d 637, 650 (1983), *as modified in Ewing*, 538 U.S. at 23–24, 123 S. Ct. at 1186–87, 155 L. Ed. 2d at 118–19.  The first part of the test, sometimes referred to as the threshold test, involves a preliminary judicial evaluation of whether the sentence being reviewed is "grossly disproportionate" to the underlying crime.  *Solem*, 463 U.S. at 290–91 & n.17, 103 S. Ct. at 3010 & n.17, 77 L. Ed. 2d at 649 & n.17.  This preliminary test involves a balancing of the gravity of the crime against the severity of the sentence.  *Id.* at 291, 103 S. Ct. at 3010, 77 L. Ed. 2d at 650.  The Supreme Court has not articulated what factors go into this initial determination, but has stated that it is a " 'rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.' "  *Ewing*, 538 U.S. at 30, 123 S. Ct. at 1190, 155 L. Ed. 2d at 123 (quoting *Harmelin*, 501 U.S. at 1005, 111 S. Ct. at 2707, 115 L. Ed. 2d at 871 (Kennedy, J., concurring in part and concurring in judgment)).

If the threshold test has been crossed, the Supreme Court proceeds to steps two and three.  *Harmelin*, 501 U.S. at 1005, 111 S. Ct. at 2707, 115 L. Ed. 2d at 871 (Kennedy, J., concurring in part and concurring in judgment).  In step two, the Supreme Court engages in *intrajurisdictional* analysis, comparing the challenged sentence to sentences for other crimes within the jurisdiction.  *Solem*, 463 U.S. at 292, 103 S. Ct. at 3011, 77 L. Ed. 2d at 650.  In step three, the Supreme Court engages in *interjurisdictional* review, comparing sentences in other jurisdictions for the same or similar crimes.  *Id.*  These last two steps introduce objectivity into the determination of "gross disproportionality."

The general theory under *Solem*, *Harmelin*, and *Ewing* seems to be that a sentence for a term of years within the bounds authorized by

statute is not likely to be "grossly disproportionate" under the Cruel and Unusual Punishment Clause. Legislative judgments are generally regarded as the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual. *See McCleskey v. Kemp,* 481 U.S. 279, 301–02, 107 S. Ct. 1756, 1772, 95 L. Ed. 2d 262, 284–85 (1987).

While the Supreme Court, particularly in recent years, has emphasized objective factors in analyzing cruel and unusual punishment cases, the Court has also noted that "objective evidence, though of great importance, [does] not 'wholly determine' the controversy, 'for the Constitution contemplates that in the end our own judgment will be brought to bear on the question . . . . ' " *Atkins v. Virginia,* 536 U.S. 304, 312, 122 S. Ct. 2242, 2247, 153 L. Ed. 2d 335, 345 (2002) (quoting *Coker v. Georgia,* 433 U.S. 584, 597, 97 S. Ct. 2861, 2868, 53 L. Ed. 2d 982, 992 (1977)).

2. *Validity of enhanced sentences for recidivists.* The Supreme Court has had three occasions to directly consider the validity of lengthy sentences under criminal statutes that impose enhanced sentences on recidivists. In *Rummel,* the Court upheld a lifetime sentence—with the possibility of parole in ten or twelve years—under a Texas three strikes statute where the defendant's offenses all involved nonviolent property crimes and the monetary value of all three crimes totaled less than $250.00. *Rummel,* 445 U.S. at 265–66, 284, 100 S. Ct. at 1134–35, 1144–45, 63 L. Ed. 2d at 385–86, 397. In *Solem,* the Court vacated a sentence where the defendant, convicted of uttering a "no account" check for $100, was sentenced to life in prison without possibility of parole because of six prior felony convictions. *Solem,* 463 U.S. at 279–81, 303, 103 S. Ct. at 3004–05, 3016, 77 L. Ed. 2d at 642–43, 657–58. Finally, in

*Ewing*, the Court held that the theft of three golf clubs valued at $1200, when coupled with prior nonviolent property crimes, was sufficient to support a sentence of twenty-five years to life. *Ewing*, 538 U.S. at 18–20, 29–30, 123 S. Ct. at 1183–85, 1189–90, 155 L. Ed. 2d at 115–16, 123.

In a fourth case, *Lockyer*, the defendant was sentenced as a recidivist to two consecutive terms of twenty-five years to life where the final conviction consisted of stealing nine videotapes on two separate occasions. *Lockyer*, 538 U.S. at 66–68, 123 S. Ct. at 1169–71, 155 L. Ed. 2d at 152–53. The defendant's cruel-and-unusual-punishment claim, however, was raised in the context of a federal habeas corpus proceeding with a restricted standard of review. *Id.* at 69, 123 S. Ct. at 1171, 155 L. Ed. 2d at 154. The court in *Lockyer* declined to intervene, noting that the sentence did not violate "clearly established law." *Id.* at 77, 123 S. Ct. at 1175, 155 L. Ed. 2d at 159.

As is apparent from these cases, the Supreme Court has generally supported harsh and severe sentences for repeat offenders even when the later offense was nonviolent. Further, the Supreme Court has found that incapacitation is among the legitimate penological objectives that a state may further through long prison sentences. *Ewing*, 538 U.S. at 25, 123 S. Ct. at 1187, 155 L. Ed. 2d at 120; *Harmelin*, 501 U.S. at 999, 111 S. Ct. at 2704, 115 L. Ed. 2d at 867–68 (Kennedy, J., concurring in part and concurring in judgment).[3]

3. *Role of individualized determination.* In *Woodson v. North Carolina*, 428 U.S. 280, 303–04, 96 S. Ct. 2978, 2990–91, 49 L. Ed. 2d 944, 960–61 (1976), the Supreme Court held that in death penalty cases, courts must engage in consideration of the character and record of the

---

[3]Incapacitation as a goal of criminal sentencing has been criticized in academia. *See generally* Paul H. Robinson, *Punishing Dangerousness: Cloaking Preventive Detention as Criminal Justice,* 114 Harv. L. Rev. 1429 (2001).

individual offender and the circumstances of the particular offense before the death penalty may be imposed. *See also Enmund v. Florida*, 458 U.S. 782, 798, 102 S. Ct. 3368, 3377, 73 L. Ed. 2d 1140, 1152 (1982). *Woodson* established a prerequisite legal requirement in all death penalty cases.

The question arises whether a criminal defendant in a noncapital case may attempt to attack a sentence *as applied* as constituting cruel and unusual punishment. The question of whether a defendant may attack a statute as applied as cruel and unusual is a different question than that considered in *Woodson*, where the statute was facially invalid. A noncapital criminal statute that does not require an individualized determination regarding the appropriate sentence may be valid in many, but not all applications.

In *Rummel*, the Supreme Court seemed to utilize an individualized approach where a defendant challenged his lengthy noncapital sentence under recidivist statutes. The Court noted that the defendant did not challenge the constitutionality of the applicable recidivist statute as a general proposition. *Rummel*, 445 at 270–71, 100 S. Ct. at 1137, 63 L. Ed. 2d at 388–89. Instead, Rummel challenged only the result of applying a concededly valid statute to the facts of his case. *Id.* The court then proceeded to consider, among other factors, the length of a prison term in real time (time that is likely to be served), the defendant's triggering criminal conduct (the offender's actual behavior or other offense-related circumstances), and the offender's criminal history. *Id.* at 265–81, 100 S. Ct. at 1134–43, 63 L. Ed. 2d at 385–95.

The Court seemed to take a similar approach in *Solem*. There, the court noted, among other things, that the culpability of the offender, including his intent or motive in committing a crime, may be considered

in determining the proportionality of the penalty to the offense. *Solem*, 463 U.S. at 293, 103 S. Ct. at 3011, 77 L. Ed. 2d at 651.

After *Rummel* and *Solem*, the court decided *Harmelin*. Among other arguments, Harmelin claimed that it was "cruel and unusual" to impose a mandatory sentence of life in prison for drug possession. *Harmelin*, 501 U.S. at 994, 111 S. Ct. at 2701, 115 L. Ed. 2d at 864. In part IV of his plurality opinion, Justice Scalia expressly refused to consider expanding the "individualized capital sentencing doctrine" outside the capital punishment context. *Id.* at 995, 111 S. Ct. at 2701–02, 115 L. Ed. 2d at 865. Justice Scalia noted, "We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further." *Id.* at 996, 111 S. Ct. at 2702, 115 L. Ed. 2d at 865.

Justice Scalia's opinion could be broadly interpreted to mean that when considering cruel and unusual punishment challenges to a sentence, individualized analysis of the seriousness of the crime and the culpability of the offender is never appropriate outside the capital context. But there is also a narrower interpretation. In part IV, Justice Scalia was responding to the position that a statute imposing a mandatory sentence of life in prison, on its face, is unconstitutional and could not be applied against anyone. Justice Scalia rejected this facial argument. But a rejection of a *facial* challenge to a mandatory sentencing statute on the ground that individualized sentencing is not *statutorily required* does not mean that individualized analysis is never appropriate in a noncapital cruel and unusual punishment case.

Narrowly read, the only proposition in part IV of Justice Scalia's opinion in *Harmelin* is that a mandatory sentencing statute cannot be stricken from the statute books and applied to no one, even the most

deserving defendant, because of a lack of individualized sentencing. Part IV of the Scalia opinion simply does not address the question of whether a defendant may concede the facial validity of a mandatory sentencing statute, but then attack the constitutionality of its application in a particular case in light of all the facts and circumstances involved.

A narrow reading of part IV of Justice Scalia's *Harmelin* opinion is supported by the Court's subsequent opinion in *Ewing.* In *Ewing,* the Court considered the constitutionality of a recidivist statute imposing a twenty-five-years-to-life sentence for property crimes. *Ewing*, 538 U.S. at 19–20, 123 S. Ct. at 1184–85, 155 L. Ed. 2d at 116. In *Ewing*, the Court was highly fractured and no opinion commanded a majority. In her opinion joined by two other members of the court, Justice O'Connor examined the details of Ewing's criminal record, which included numerous separate terms of incarceration, commission of crimes while on parole, and serious felonies including robbery and three residential burglaries. *Id.* at 18–19, 123 S. Ct. at 1183–84, 155 L. Ed. 2d at 115–16. Under these facts and circumstances, Justice O'Conner declared that "Ewing's is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.' " *Id.* at 30, 123 S. Ct. at 1190, 155 L. Ed. 2d at 123 (quoting *Harmelin*, 501 U.S. at 1005, 111 S. Ct. at 2707, 115 L. Ed. 2d at 871 (Kennedy, J., concurring in part and concurring in judgment)).

In reaching her decision, Justice O'Conner does not seem to be conducting a facial examination of the statute, where the underlying facts and circumstances would be entirely irrelevant. Instead, Justice O'Connor appears to be undertaking an analysis of the constitutionality of the statute *as applied* to Ewing. According to Justice O'Connor, it is Ewing's *case* that does not meet the gross disproportionality threshold of

*Solem,* not the statute itself. Justice Breyer's dissenting opinion in *Ewing,* joined by three other members of the court, explicitly embraces the fact-specific approaches in *Rummel* and *Solem. Id.* at 36–39, 123 S. Ct. at 1193–95, 155 L. Ed. 2d at 127–29 (Breyer, J., dissenting). As a result, a majority of the Supreme Court in *Ewing* seems to approve of an as-applied challenge to an otherwise valid statute under the Cruel and Unusual Punishment Clause of the Eighth Amendment.

4. *Relevance of juvenile status in cruel and unusual punishment analysis.* The Supreme Court has also struggled with the proper application of the Cruel and Unusual Punishment Clause to juvenile defendants facing the death penalty. The cases have meandered. *Compare Thompson v. Oklahoma,* 487 U.S. 815, 838, 108 S. Ct. 2687, 2700, 101 L. Ed. 2d 702, 720–21 (1988) (vacating death sentence in case involving juvenile), *and Eddings v. Oklahoma,* 455 U.S. 104, 116–17, 102 S. Ct. 869, 877–78, 71 L. Ed. 2d 1, 12 (1982) (same), *with Stanford v. Kentucky,* 492 U.S. 361, 379–80, 109 S. Ct. 2969, 2980, 106 L. Ed. 2d 306, 324–25 (1989) (finding death penalty could be applied to sixteen- or seventeen-year-olds).

Most recently, however, the Supreme Court in *Roper v. Simmons,* 543 U.S. 551, 556, 125 S. Ct. 1183, 1187, 161 L. Ed. 2d 1, 13 (2005), considered a death sentence imposed on a seventeen-year-old convicted of murder. Justice Kennedy begins his analysis with a review of other jurisdictions. *Roper,* 543 U.S. at 564, 125 S. Ct. at 1192, 161 L. Ed. 2d at 18. Although twenty states did not formally prohibit the death penalty for juveniles, Justice Kennedy stressed that, in practice, juvenile execution was infrequent. *Id.* at 564, 125 S. Ct. at 1192, 161 L. Ed. 2d at 18–19. Based on the infrequency of its use even when it remained on the books and the growing trend toward abolition of the practice, Justice

Kennedy concluded that juveniles were " 'categorically less culpable than the average criminal.' " *Id.* at 567, 125 S. Ct. at 1194, 161 L. Ed. 2d at 20–21 (quoting *Atkins v. Virginia,* 536 U.S. 304, 316, 122 S. Ct. 2242, 2249, 153 L. Ed. 2d 335, 347 (2002)).

After noting that the Eighth Amendment applied to the death penalty with "special force," Justice Kennedy next turned to consideration of the mental abilities of juveniles. *Id.* at 568, 125 S. Ct. at 1194, 161 L. Ed. 2d at 21. Citing the common experience of parents, confirmed by scientific and sociological studies, Justice Kennedy noted that juveniles tend to have immature judgment and act impulsively and without a full appreciation of the consequences of their actions, were more susceptible to negative peer influences than adults, were dependent on parents and others, and had personalities that were less well developed and more transitory than adults. *Id.* at 569–72, 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 21–23. Justice Kennedy noted that as a result of their immature judgment, impulsivity, dependence on others, and lack of responsibility, nearly all states prohibit persons under eighteen years of age from voting, serving on juries, or marrying without parental consent. *Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22. Finally, Justice Kennedy surveyed international law, noting that various sources of international law condemn the death penalty for juveniles and that only a few countries continue the practice. *Id.* at 576–77, 125 S. Ct. at 1198–99, 161 L. Ed. 2d at 26–27.

Because of the psychosocial and neurological differences between juveniles and adults, Justice Kennedy wrote that the penological justifications for the death penalty—retribution and general deterrence— apply to juveniles "with lesser force than to adults." *Id.* at 571, 125 S. Ct. at 1196, 161 L. Ed. 2d at 23. Justice Kennedy noted that

"punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person." *Id.* at 572, 125 S. Ct. at 1196, 161 L. Ed. 2d at 23. As a result, the death penalty categorically could not be applied to juveniles.

*Roper* involved the constitutionality of the death penalty applied to juveniles, but its analysis has potentially broader impact notwithstanding the language of limitation in the opinion. In particular, academics began to assert that the analysis in *Roper* could be applied to challenge sentences of juveniles to life without possibility of parole.[4] The Supreme Court has recently agreed to hear two cases involving juveniles sentenced to imprisonment for life without possibility of parole for noncapital crimes. *See Sullivan v. State*, 987 So. 2d 83 (Fla. Dist. Ct. App. 2008) (thirteen-year-old convicted of sexual battery in connection with burglary sentenced to life without possibility of parole), *cert. granted*, 78 U.S.L.W. 3015 (U.S. May 4, 2009) (No. 08-7621); *Graham v. State*, 982 So. 2d 43 (Fla. Dist. Ct. App. 2008) (sixteen-year-old sentenced to life in prison without possibility of parole based on armed burglaries, attempted robberies, and parole violation), *cert. granted*, 78 U.S.L.W. 3015 (U.S. May 4, 2009) (No. 08–7412). These cases could shed some light on the viability of a *Roper*-type reasoning outside the death

---

[4]*See generally* Barry C. Feld, *A Slower Form of Death:  Implications of* Roper v. Simmons *for Juveniles Sentenced to Life Without Parole*, 22 Notre Dame J.L. Ethics & Pub. Pol'y 9 (2008). Melanie Deutsch, *Minor League Offenders Strike Out in the Major League:  California's Improper Use of Juvenile Adjudications as Strikes*, 37 Sw. U. L. Rev. 375 (2008); Elisa Poncz, *Rethinking Child Advocacy After* Roper v. Simmons*: "Kids Are Just Different" and "Kids Are Like Adults" Advocacy Strategies*, 6 Cardozo Pub. L. Pol'y & Ethics J. 273 (2008); Enrico Pagnanelli, *Children as Adults:  The Transfer of Juveniles to Adult Courts and the Potential Impact of* Roper v. Simmons, 44 Am. Crim. L. Rev. 175 (2007); Suzanne Meiners-Levy, *Challenging the Prosecution of Young "Sex Offenders": How Developmental Psychology and the Lessons of* Roper *Should Inform Daily Practice*, 79 Temp. L. Rev. 499 (2006).

penalty context under the Cruel and Unusual Punishment Clause of the United States Constitution.

**B. Federal Cruel and Unusual Punishment Cases.**

1. *Introduction.* The lower federal courts have, of course, followed the cruel and unusual punishment framework developed by the United States Supreme Court. In light of the fact that the Supreme Court has found only two noncapital sentences invalid under the Cruel and Unusual Punishment Clause in the past one hundred years, *Weems v. United States*, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed 793 (1910), and *Solem*, the vast majority of federal appellate cases apply the stringent standards developed by the Supreme Court and deny relief to defendants in a conclusory fashion. In the words of one federal appellate court, finding a sentence grossly disproportionate under the Eighth Amendment will be "hen's-teeth rare." *United States v. Polk*, 546 F.3d 74, 76 (lst Cir. 2008).

2. *Validity of as-applied challenge.* Some federal appellate courts have been willing to engage in an examination of the specific facts and circumstances involved in a crime when a defendant challenges a sentence as cruel and unusual as applied. For instance, in *Henderson v. Norris*, 258 F.3d 706, 707 (8th Cir. 2001), the Eighth Circuit Court of Appeals invalidated a life sentence for first-offense delivery of .238 grams of cocaine base. The court emphasized the small amount of drug involved, the fact that the defendant did not initiate contact with an informant who bought the drug, and that there was no indication that the defendant engaged in violence, had any weapons, or indicated any other "trappings" of the drug trade. *Henderson*, 258 F.3d at 710; *see also United States v. Nagel*, 559 F.3d 756, 763 (7th Cir. 2009) (analyzing both a facial and an as-applied cruel-and-unusual-punishment

challenge); *Hawkins v. Hargett*, 200 F.3d 1279, 1283 (10th Cir. 1999) (noting the defendant's age as a factor in his cruel-and-unusual-punishment claim).

Many federal courts engage in what one commentator has referred to as "color matching" by comparing the facts of a given case with those of *Rummel*, *Solem*, *Harmelin*, or *Ewing* to determine whether the facts of the case at hand, at a very high level of abstraction, are on par with those in the Supreme Court precedents. Donna H. Lee, *Resuscitating Proportionality in Noncapital Criminal Sentencing*, 40 Ariz. St. L.J. 527, 579–82 (2008). "Color matching is legal analysis by analogy as opposed to a deeper, rule-based analysis that legitimately applies principles of stare decisis." *Id.* at 579.

3. *Federal appellate cases considering* Roper *outside the capital context.* A number of federal appellate courts have also had occasion to consider whether the reasoning in *Roper*—namely, that juveniles are categorically not as criminally culpable as adults—extends outside the death penalty context. Federal courts in the Fifth, Seventh, and Eleventh Circuits have declined to extend *Roper* outside the death penalty in a variety of situations. *See, e.g., United States v. Salahuddin*, 509 F.3d 858, 863–64 (7th Cir. 2007) (upholding sentence enhancement based on armed robbery conviction committed as a juvenile); *United States v. Mays*, 466 F.3d 335, 340 (5th Cir. 2006) (upholding life sentence for possession with intent to distribute crack cocaine under recidivist statute where prior adult conviction occurred at age seventeen); *United States v. Wilks*, 464 F.3d 1240, 1243 (11th Cir. 2006) (upholding enhanced sentence where prior youthful offender convictions included aggravated assault, grand theft, burglary with assault, and strong-arm robbery).

In limiting *Roper*'s application outside the capital context, lower federal courts generally stress that "death is different"—the Eighth Amendment applies with "special force" in death penalty cases. *Salahuddin*, 509 F.3d at 863–64; *Mays*, 466 F.3d at 340; *Wilks*, 464 F.3d at 1243. These courts also distinguish *Roper*, where the defendant's punishment for a crime committed as a juvenile was at issue, from cases where a defendant's sentence for a crime committed as an adult is enhanced by a prior conviction committed when the defendant was under eighteen. *Salahuddin*, 509 F.3d at 863–64; *Mays*, 466 F.3d at 340; *Wilks*, 464 F.3d at 1243.[5]

---

[5]Yet, there is at least a filament in recent case law recognizing age as a relevant consideration in sentencing. For instance, in *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005), the district court sentenced a defendant who pled guilty to one count of conspiracy to distribute "ecstasy" to thirty-six months probation. The district court noted that all of the defendant's criminal conduct, including the offense for which he was being sentenced, occurred when Gall was twenty-one years old or younger. *Gall*, 374 F. Supp. 2d at 762. In considering the appropriate sentence, the district court reasoned, "Immaturity at the time of the offense conduct is not an inconsequential consideration." *Id.* at 762 n.2. The court went on to note that it was "of critical importance in the area of criminal law" that brain development may not be complete until age twenty-five. *Id.* Citing *Roper*, the district court concluded that while age did not excuse the behavior, it should be taken into account when inquiring into the conduct of the defendant. *Id.*

On appeal, the Court of Appeals for the Eighth Circuit reversed, concluding, among other things, that the district court improperly relied upon general studies that showed persons under the age of eighteen generally lack maturity and are less culpable than adults. *United States v. Gall*, 446 F.3d 884, 890 (8th Cir. 2006). According to the Eighth Circuit, the general studies did not explain the defendant's behavior in the instant case. *Id.* Further, the appellate court pointed out that the defendant sold ecstasy as a twenty-one-year-old adult, not as an adolescent. *Id.*

The United States Supreme Court reversed the Eighth Circuit. *Gall v. United States*, 552 U.S. 38, 59, 128 S. Ct. 586, 602, 169 L. Ed. 2d 445, 463 (2007). In an opinion by Justice Stevens, the Supreme Court noted that under applicable federal law, the district court was to "consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.' " *Gall*, 552 U.S. at 50 n.6, 128 S. Ct. at 596–97 n.6, 169 L. Ed. 2d at 457 n.6 (quoting 18 U.S.C. § 3553(*a*)(1) (2000 ed., Supp. V.)). Reviewing the district court's treatment of the age issue, the Supreme Court concluded that "it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor . . . ." *Id.* at 58, 128 S. Ct. at 601, 169 L. Ed. 2d at 462.

### C. Cruel and Unusual Punishment Under State Constitutions.

1.  *Introduction.*  Most state constitutions contain cruel and unusual punishment provisions that are similar, if not identical, to the Cruel and Unusual Punishment Clause of the Eighth Amendment.[6]  In construing the meaning of these state constitutional provisions, state courts are free to develop their own independent approaches to state constitutional doctrine.  Some state supreme courts have followed the lead of the United States Supreme Court and adopted approaches to state constitutional provisions that mirror the developing federal law and have achieved similar results.  *See Adaway v. State*, 902 So. 2d 746, 747–52 (Fla. 2005) (upholding life sentence for thirty-six-year-old engaging in oral sex with eleven-year-old under state and federal constitutions by comparing seriousness of crime with offenses in *Harmelin* and *Ewing*).  Some have gone even further and held that a sentence that falls within the legislatively-established range of sentences cannot be declared cruel and unusual.  *See Price v. State*, 898 So. 2d 641, 655 (Miss. 2005).  Other state courts, however, have adopted a more searching approach to cruel and unusual punishment.[7]

2.  *Acceptance of federal framework with independent application.*  One line of state supreme court cases departs from United States

---

[6]A majority of the state constitutions prohibit "cruel and unusual" punishment. *See, e.g.*, Ariz. Const. art. II, § 15; Colo. Const. art. II, § 20; Mo. Const. art. I, § 21. Some state constitutions, however, prohibit "cruel or unusual" punishment. *See, e.g.*, Mich. Const. art. I, § 16; Okla. Const. art. II, § 9.

[7]*See In re Lynch*, 503 P.2d 921, 927–30 (Cal. 1972) (employing a shocks the conscience and offends human dignity test); *People v. Sharpe*, 839 N.E.2d 492, 498 (Ill. 2005) (disjunctive test involving wholly disproportionate penalties or penalties more harsh than for less serious or identical offenses); *State v. Ortega-Cadelan*, 194 P.3d 1195, 1198 (Kan. 2008) (applying disjunctive three-pronged test including individual analysis of the nature of offense and character of offender).

Supreme Court precedent by generally adopting the Supreme Court's[8] analytical framework for cruel-and-unusual-punishment claims but applying it in a more stringent fashion. For instance, in *People v. Bullock*, 485 N.W.2d 866, 870–71 (Mich. 1992), the Michigan Supreme Court reviewed the same drug-sentencing statute upheld by the United States Supreme Court in *Harmelin* under its state constitution. The Michigan Supreme Court generally accepted the principles developed by the Supreme Court, but emphasized that it was free to follow what the court considered the better-reasoned dissenting opinions. *Bullock*, 485 N.W.2d at 870–74. The court then proceeded to rely heavily on Justice White's dissenting opinion in *Harmelin*, emphasizing that " 'punishment must be tailored to a defendant's personal responsibility and moral guilt.' " *Id.* at 876 (quoting *Harmelin*, 501 U.S. at 1023, 111 S. Ct. at 2716, 115 L. Ed. 2d at 883) (White, J., dissenting)); *see also State v. Fain*, 617 P.2d 720, 723, 725–28 (Wash. 1980) (generally applying the framework developed by the United States Supreme Court but relying in part on dissent in *Rummel* to reach a different result); *Wanstreet v. Bordenkircher*, 276 S.E.2d 205, 212–14 (W. Va. 1981) (invalidating life sentence under recidivist statute using *Solem*-type review).

3. *Validity of as-applied challenge.* Many state courts have also considered whether a criminal defendant may attack a sentence as cruel

---

[8]The approach of the United States Supreme Court to the Cruel and Unusual Punishment Clause has its critics. Some emphasize the inconsistency in the Court's relatively aggressive approach to punitive damages and its highly deferential approach to criminal sanctions. *See, e.g.*, Erwin Chemerinsky, *The Constitution and Punishment*, 56 Stan. L. Rev. 1049 (2004); Adam M. Gershowitz, Note, *The Supreme Court's Backwards Proportionality Jurisprudence: Comparing Judicial Review of Excessive Criminal Punishments and Excessive Punitive Damages Awards*, 86 Va. L. Rev. 1249 (2000). Some embrace parts, but not all, of the Supreme Court's framework. *See generally* Donna H. Lee, *Resuscitating Proportionality in Noncapital Criminal Sentencing*, 40 Ariz. St. L.J. 527 (2008).

and unusual punishment as applied. Under an as-applied attack, a criminal statute imposing a certain sentence is not facially invalid in all circumstances, but only as applied under the facts and circumstances in a particular case.

Many state courts, particularly post-*Ewing,* have allowed as-applied attacks based on individualized facts and circumstances. *See Graham,* 982 So. 2d at 48 (discussing difference in cruel and unusual punishment context between facial attack and attack as applied); *Humphrey v. Wilson,* 652 S.E.2d 501, 510 (Ga. 2007) (citing narrow age difference and fact that fifteen-year-old girl initiated oral sex as factors in invalidating sentence as cruel and unusual); *People v. Miller,* 781 N.E.2d 300, 306–09 (Ill. 2002) (finding application of statutes that treat fifteen-year-old who stood as a lookout during the shooting and had only a moment to consider his participation, but never handled a gun, the same as the shooter in imposing life in prison without possibility of parole unconstitutional under state constitution); *Kills on Top v. State,* 928 P.2d 182, 206–07 (Mont. 1996) (finding individualized determination beyond reckless indifference required to determine validity of death penalty in felony murder context); *Naovarath v. State,* 779 P.2d 944, 948–49 (Nev. 1989) (invalidating as cruel and unusual punishment a life sentence without possibility of parole on thirteen-year-old in light of specific facts).

4. *State cases considering* Roper *outside capital context.* A number of state cases have considered the application of *Roper* outside the context of capital punishment. The case that is closest to the present controversy is *State v. Rideout,* 933 A.2d 706 (Vt. 2007). In *Rideout,* the defendant was convicted of two counts of lewd and lascivious conduct with a child and one count of furnishing drugs to a child. *Rideout,* 933 A.2d at 708. He was subsequently sentenced under a Vermont habitual

offender statute to two concurrent sentences of twenty to fifty years. *Id.* at 710. The defendant asserted that the sentence as applied to him constituted cruel and unusual punishment because four of his six predicate felonies occurred when he was sixteen years of age. *Id.* at 713.

The *Rideout* court rejected the claim. *Id.* at 716. The court cited extensive federal and state case law prior to *Roper* generally standing for the proposition that convictions of minors in adult court may be used to enhance sentences of adults convicted of crimes. *Id.* at 715. The *Rideout* court distinguished cases refusing to allow juvenile adjudications to count toward habitual offender status on the ground that they were based upon the lack of procedural protections in juvenile court, specifically, the right to a jury trial. *Id.* at 715–16.

The *Rideout* court distinguished *Roper*, noting the imposition of the death penalty and not imprisonment was "a distinction critical to *Roper*'s reasoning." *Id.* at 718. Further, citing *Witte v. United States*, 515 U.S. 389, 400, 115 S. Ct. 2199, 2206, 132 L. Ed. 2d 351, 364 (1995), the *Rideout* court noted that the defendant in *Roper* was sentenced to death solely for an offense committed while he was a minor, whereas in *Rideout*, the defendant was receiving a sentence for an adult crime even though the adult sentence was enhanced by crimes committed as a minor. *Id.* at 719. According to the *Rideout* court, *Roper* was premised, in part, on the opportunity for minor offenders to mend their ways. *Id.* The *Rideout* court noted that when dealing with recidivist adult offenders, with juvenile records, that possibility has largely gone by. *Id.*

A few other state court cases have considered whether a *Roper*-type analysis applies outside the death penalty for juvenile conduct. These cases have generally declined to extend *Roper* to other contexts. *See State v. Allen*, 958 A.2d 1214, 1233–36 (Conn. 2008) (declining to

extend *Roper* to eighteen-year-old sentenced to life without possibility of parole); *Wallace v. State*, 956 A.2d 630, 641 (Del. 2008) (declining to extend *Roper* to fifteen-year-old defendant sentenced to life in prison); *England v. State*, 940 So. 2d 389, 406–07 (Fla. 2006) (finding use of juvenile convictions as aggravating factors supporting death penalty not contrary to *Roper*).

5. *Case law involving challenges to nonviolent sex crimes generally.* State courts have invalidated lengthy sentences for nonviolent sex crimes. In *State v. Davis*, 79 P.3d 64, 66–67 (Ariz. 2003), a twenty-year-old defendant was sentenced to a mandatory minimum of fifty-two years without the possibility of parole as a result of his conviction on four counts of statutory rape for engaging in consensual sex with two post-pubescent teenage girls. After reviewing recent Supreme Court cases, the *Davis* court overruled its prior precedent and held that the court could undertake an individualized analysis of the penalty under the facts of the case. *Davis*, 79 P.3d at 71. The *Davis* court found under the facts of the case that the threshold test of gross disproportionality had been met, noting that Davis was "caught in the very broad sweep" of a statute which

> makes any sexual conduct with a person younger than fifteen years old by a person older than eighteen years old a "dangerous crime against children," whether the offense is a rape-incest by a step-parent who forces sex on a trusting ward or a pedophile who uncontrollably preys upon young children . . . or the more benign boyfriend-girlfriend situation in which one party is older than eighteen and the other younger than fifteen.

*Id.* at 72 (quoting *State v. Taylor*, 773 P.2d 974, 976 (Ariz. 1989)). The court noted that the fact that other courts impose lengthy sentences for sex crimes "demonstrate[s] why, when considering the proportionality of a sentence imposed, this court must look beyond the nomenclature of

the crime charged and consider the facts of each particular case." *Id.* at 74.

**D. Approach to Cruel and Unusual Punishment Under the Iowa Constitution.** Article I, section 17 of the Iowa Constitution prohibits cruel and unusual punishment in language materially identical to its federal counterpart. Our past cases have generally assumed that the standards for assessing whether a sentence amounts to cruel and unusual punishment under the Iowa Constitution are identical to the Federal Constitution. *State v. Musser*, 721 N.W.2d 734, 749 (Iowa 2006).

In a number of cases, we have addressed whether the court may consider individual facts and circumstances in evaluating a challenge to a sentence as cruel and unusual. Our recent cases, relying in part on *Harmelin*, have indicated that an individualized challenge to the application of a statutorily-authorized sentence may not lie in the context of convictions for indecent exposure, criminal transmission of HIV, first-degree burglary, and commission of multiple forceable felonies. *State v. Wade*, 757 N.W.2d 618, 624 (Iowa 2008); *Musser*, 721 N.W.2d at 749; *State v. Rubino*, 602 N.W.2d 558, 564 (Iowa 1999); *State v. August*, 589 N.W.2d 740, 743 (Iowa 1999).

We have also considered attacks on mandatory sentences. In *State v. Fuhrmann*, 261 N.W.2d 475 (Iowa 1978), we considered an attack on Iowa Code section 690.2, which mandated a life sentence for first-degree murder. We rejected the challenge, noting that life imprisonment for first-degree murder does not shock the conscience or sense of justice. *Fuhrmann*, 261 N.W.2d at 479–80. We considered the holding in *Fuhrmann* as dispositive in *State v. Horn*, 282 N.W.2d 717, 732 (Iowa 1979), where a defendant challenged a life sentence without the possibility of parole as cruel and unusual based on the fact that he was

twenty years old at the time of the offense. We have also upheld mandatory prison terms in the face of cruel and unusual punishment challenges in a variety of other contexts. *See State v. Phillips*, 610 N.W.2d 840, 843–44 (Iowa 2000) (holding ten-year mandatory sentence for second-degree robbery does not rise to cruel and unusual punishment); *August*, 589 N.W.2d at 744 (finding forty-two-and-one-half-year mandatory, consecutive sentence for kidnapping in the second-degree and first-degree robbery not cruel and unusual); *State v. Lara*, 580 N.W.2d 783, 786 (Iowa 1998) (finding mandatory minimum sentence of over twenty-one years for first-degree robbery permissible).

**E. Application of Principles to Bruegger's Claim Under the Iowa Constitution.**

1. *Standard to be applied under state constitution.* Because Bruegger has not advanced a standard for interpreting the cruel and unusual punishment provision under the Iowa Constitution differently from its federal constitutional counterpart, we will apply the general principles as outlined by the United States Supreme Court for addressing a cruel-and-unusual-punishment challenge under the Iowa Constitution. *See In re Detention of Garren*, 620 N.W.2d 275, 280 n.1 (Iowa 2000).

Even so, we do not necessarily apply the federal standards in the same way as the United States Supreme Court. For instance, in *Racing Association of Central Iowa v. Fitzgerald*, 648 N.W.2d 555, 562 (Iowa 2002), this court ruled that a statutory scheme taxing slot machines at racetracks at a higher rate than similar machines on riverboats violated equal protection. The United States Supreme Court reversed, holding that the Federal Equal Protection Clause, as properly applied, did not invalidate the classification. *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 110, 123 S. Ct. 2156, 2161, 156 L. Ed. 2d 97, 105 (2003). On

remand, we applied established federal equal protection principles in a different and more stringent fashion under our state constitution. *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 6–7 (Iowa 2004) [hereinafter *RACI*]. We declared that a rational-basis review of legislation was not a "toothless" exercise in Iowa, and we came to a different result than that reached by a unanimous Supreme Court in the same case. *Id.* at 9.

The principles of *RACI* apply in the cruel and unusual punishment context as well. As in *RACI*, we conclude that review of criminal sentences for "gross disproportionality" under the Iowa Constitution should not be a "toothless" review and adopt a more stringent review than would be available under the Federal Constitution. *See, e.g., Fain*, 617 P.2d at 725–28; *Wanstreet*, 276 S.E.2d at 212–14.

We also consider the applicability of *Roper* under the Iowa Constitution. As noted previously, the Supreme Court in *Roper* emphasized that its *categorical ruling* that the death penalty could not be applied to *any person* under the age of eighteen *for any crime* was limited to death penalty cases. Nonetheless, the reasoning in *Roper*, namely, that psychosocial and neurological studies show that juvenile brains are less developed and that, as a result, they are less culpable than adult offenders, has applicability outside the death penalty context. While it may be, as *Roper* suggests, that the only penalty that is categorically off the table for persons under eighteen is death, this does not mean that the age of an offender can never be a factor for cruel and unusual punishment analysis.

2. *Attack on sentence as applied.* Bruegger does not clearly distinguish between a facial attack or an attack as applied in his appeal. The language in Bruegger's brief, however, emphasizing the specific facts

of the case, including a claim that K.S. was in love with him and consented to sexual intercourse, and that, as a result, the degree of his criminal culpability based upon his current crime and prior juvenile adjudication did not justify the lengthy mandatory sentence, evidences an as-applied challenge. Although not properly labeled, Bruegger's brief is essentially an attack on his sentence as cruel and unusual as applied to him, under all the facts and circumstances.

We recognize that many of our cases reject individualized determinations in connection with cruel-and-unusual-punishment challenges in a number of contexts. *See, e.g., Wade,* 757 N.W.2d at 624; *Musser,* 721 N.W.2d at 749; *Rubino,* 602 N.W.2d at 564; *August,* 589 N.W.2d at 743. It is not always clear in these cases whether the court was rejecting a mandatory requirement of an individualized showing, as was required in *Woodson,* or the possibility of an as-applied challenge.

In any event, we do not believe that a defendant can never challenge a sentence as cruel and unusual as applied. If individualized consideration of the facts and circumstances were never allowed, legislatures could eviscerate judicial review of the proportionality of punishment by broadly defining crimes and imposing mandatory stiff penalties in all cases. Such broadly-framed statutes would survive facial attack if the accompanying penalties were appropriate to some but not all crimes within the statute's broad ambit.

As a result, we conclude that, at least in some instances, defendants who commit acts of lesser culpability within the scope of broad criminal statutes carrying stiff penalties should be able to launch an as-applied cruel and unusual punishment challenge. *See Davis,* 79 P.3d at 72–73 (holding where broad sweep of statute makes no distinction between perpetrators of incest, serial pedophiles, and

statutory rape, an as-applied challenge was permissible); *State v. Berniard*, 860 So. 2d 66, 75 (La. Ct. App. 2003) (holding defendant may attack mandatory sentence by showing he is exceptional, that legislature has failed to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case).

The question is, then, whether this is a relatively rare case where an individualized assessment of the punishment imposed should be permitted. We conclude that it is. This case involves an unusual combination of features that converge to generate a high risk of potential gross disproportionality—namely, a broadly framed crime, the permissible use of preteen juvenile adjudications as prior convictions to enhance the crime, and a dramatic sentence enhancement for repeat offenders. Each of these factors, standing alone, has the potential of introducing a degree of disproportionality into a sentence, but the convergence of these three factors presents a substantial risk that the sentence could be grossly disproportionate as applied. We thus conclude that Bruegger should be allowed to make an individualized showing that the sentence is cruel and unusual as applied to him.

The first factor, breadth of crime, is an important one. The crime of statutory rape covers a wide variety of circumstances, from Romeo and Juliet relationships to much more objectionable situations involving the luring of youngsters by older individuals using manipulative techniques, positions of authority, threats of violence, and other aggravating factors. The legislature has, in part, recognized the variety of contexts in which the crime is committed by providing a broad range of penalties for the unenhanced crime of statutory rape.

The second factor—namely, Bruegger's age as a preteen when the predicate offense was committed—is also material. If the prior crime occurred while the defendant was an adult, that might yield a different result. Here, however, the prior crime occurred when Bruegger was twelve. The underlying rationale in *Roper* is that a past act as a juvenile is not comparable to an adult act, and yet that is exactly what the statute does here, making no distinction between prior juvenile adjudications and prior adult convictions.

It is true that under *Ewing*, the focus is said to be on the current crime, and Bruegger did commit his current crime as an adult. But the prior criminal history is what makes the current crime more aggravated, and if the prior criminal offense was committed by a preteen, it seems to follow that Bruegger is entitled to an opportunity to show that the consequences of his adolescent act become grossly disproportional to his sentence for the adult crime.

We also note that the legislative policy regarding juvenile offenders is not entirely clear or consistent. In Iowa, a person who is under fourteen years of age cannot be tried as an adult in criminal court. Iowa Code § 232.45(6)(*a*). This limitation appears to be a recognition that persons under fourteen should not be criminally culpable for their acts. If this is true, it seems inconsistent to suggest that the act of a twelve-year-old is a sufficient basis to dramatically enhance an adult sentence for the crime of statutory rape.

We finally note that the increase in sentence under Iowa Code section 901A.2(3) is geometric. The maximum sentence for Bruegger's crime, without enhancement, was ten years, subject to various good time credits. His likely prison term, even if he received the maximum sentence, would have been about four years. Under the enhanced

sentencing scheme, Bruegger must serve at least 21.25 years in prison, a five hundred percent increase in sentence. This geometric increase in sentence is another factor that contributes to our conclusion that, in this case, Bruegger is entitled to attempt to show that the enhanced sentence, as applied to him, amounts to cruel and unusual punishment.

Our narrow conclusion that Bruegger, in light of the unusual convergence of a broadly-defined criminal statute, the use of a juvenile adjudication when he was twelve to enhance his sentence, and the dramatic increase in his punishment as a result the enhancement, may bring a cruel and unusual punishment challenge to Iowa Code section 901A.2(3) as applied to him, does not resolve the case. Before the trial court, Bruegger did not raise the issue of cruel and unusual punishment. As a result, there was no evidentiary hearing where the parties presented evidence for the purpose of addressing a claim that, under the facts and circumstances, the enhanced sentence of section 901A.2(3) could not constitutionally be applied to Bruegger.

In light of this procedural posture, it is not surprising that the record is factually deficient in a number of respects. Notably, although some documents relating to Bruegger's prior Minnesota juvenile adjudication were introduced at sentencing, the record is limited regarding the underlying facts and circumstances of this offense. Further, the State has not had an opportunity to show in an evidentiary hearing that under all the facts and circumstances, a sentence under section 901A.2(3) is not cruel and unusual as applied to Bruegger. For instance, the State may wish to develop evidence regarding the impact of Bruegger's conduct on K.S. and her family, his lack of remorse, the nature of services provided in Minnesota and his inability to respond to such services, the need to incapacitate him through long-term

incarceration, and any other potential factors that tend to aggravate the gravity of the offense and magnify the consequences on K.S. We conclude, therefore, that the current record is simply inadequate to resolve the issue. The *Solem*-type approach for evaluating Bruegger's cruel-and-unusual-punishment claim cannot be applied without a proper record.

In closing, we note that Bruegger has committed a serious crime for which the legislature may impose a serious penalty. We do not view statutory rape as a victimless crime in light of the risk of disease, pregnancy, and serious psychological harm that can result from even apparently consensual sexual activity involving adults and adolescents. Nor do we believe that Bruegger's conduct as a juvenile is irrelevant to sentencing. Our sole concern here is whether, under the facts and circumstances, a mandatory sentence of 21.25 years is "off the charts." We, therefore, vacate the sentencing order of the district court and remand the case for a new sentencing hearing to allow Bruegger and the State to present evidence as to the constitutionality of section 901A.2(3) as applied to the defendant.[9] We do not retain jurisdiction.

**VI. Conclusion.**

For the above reasons, the district court's sentencing order[10] is vacated and the case remanded for further proceedings.

**SENTENCE VACATED AND CASE REMANDED WITH DIRECTIONS.**

All justices concur except Cady and Wiggins, JJ., who dissent and Baker, J., who takes no part.

---

[9]Our holding is based on Article I, section 17 of the Iowa Constitution. Because his cruel-and-unusual-punishment claim under the United States Constitution does not give him any protection beyond that afforded by the Iowa Constitution, we do not give Bruegger's federal claim further consideration.

[10]Bruegger does not challenge his conviction, but only his sentence, on appeal.

**CADY, Justice (dissenting).**

I respectfully dissent. While the majority opinion is thoughtful and compelling, I refrain from joining in it because sentencing parameters is an area of the law for which courts are required to give great deference to the policies of the legislature as written into sentencing statutes. The individual-assessment approach introduced by the majority in this case will only permit the courts to substitute their judgment for that of the legislature in cases to follow. This approach is contrary to the principles of judicial restraint and separation of powers.

Our legislature has substantially reworked the criminal-sentencing statutes over the last couple of decades in a purported effort to get tough on crime. These amendments have, in many instances, resulted in the imposition of harsh mandatory sentences for criminal offenders as compared to the sentencing scheme of yesteryear. This legislative shift has often frustrated sentencing judges, who previously possessed discretion in many instances to impose a sentence that not only fit the particular criminal act, but the particular offender. Yet, what was formerly considered a strength in the judicial branch of government turned into criticism that fueled change in the legislative branch of government. Today, sentencing in criminal cases has increasingly been transformed into the imposition of a predetermined punishment that paints all offenders of a particular crime with a single broad stroke of the brush. The new landscape, while well-intentioned, has come at a huge cost. Ultimately, it visits as much harm on society as it does to the individual offender.

Notwithstanding, the sentencing policies of today are our policies. They are a product of our legislature, as representatives of the people.

Courts do not intervene to alter these policies except when the resulting legislative scheme runs contrary to constitutional mandates. In this case, the constitutional principle at stake is the Cruel and Unusual Punishment Clause. This Clause represents one of the basic constitutional values that collectively defines us as a people, which cannot be altered by the legislature through the enactment of a statute. It embodies who we are as a people.

While I agree with the majority that there may be cases in Iowa in which courts may need to apply the Cruel and Unusual Punishment Clause in an individual manner to properly test its application to a particular sentence imposed on a particular offender, this case is not one. Instead, I would place the bar higher. The factors relied upon by the majority in this case do not warrant an as-applied challenge.

First, the nature of the crime does not warrant an as-applied challenge. Rape is a serious crime and is not diminished in any way because the offender committed the crime by playing upon the youthful vulnerabilities of the victim instead of physically overpowering the victim.

Second, the defendant was not sentenced for the conduct he engaged in as a child. Instead, he was sentenced only for his conduct as a twenty-one-year-old adult. It is abundantly clear that recidivism statutes do not punish for past conduct, but punish the conduct represented by the present offense. *See Witte v. United States*, 515 U.S. 389, 400, 115 S. Ct. 2199, 132 L. Ed. 2d 351, 364 (1995) ("In repeatedly upholding such recidivism statutes, we have rejected double jeopardy challenges because the enhanced punishment imposed for the later offense 'is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes,' but instead as 'a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a

repetitive one.' " (quoting *Gryger v. Burke*, 334 U.S. 728, 732, 68 S. Ct. 1256, 1258, 92 L. Ed. 1683, 1687 (1948)); *accord Ewing v. California*, 538 U.S. 11, 25, 123 S. Ct. 1179, 1188, 155 L. Ed. 2d 108, 120 (2003)). Thus, the most compelling factor to support a claim for cruel and unusual punishment is actually a red herring. For sure, the defendant was subjected to an enhanced sentence as a consequence of a prior juvenile act, but he was nevertheless only punished for his act as an adult. Our constitution does not contain a cruel and unusual consequence clause. The question in this case is only whether the punishment the defendant received for committing the adult crime of statutory rape was cruel and unusual.

Finally, I agree the consequences visited on the defendant for his juvenile act as a twelve-year-old child are substantial. His sentence is two and a half times longer than it would have otherwise been, and the actual time he will be incarcerated is five to six times longer. Yet, even if the enhancement of the statute was for jaywalking as a juvenile, the question is still whether the sentence of twenty-two years for statutory rape by an adult is cruel and unusual punishment. Under our strict test, it is not. A sentence of twenty-two years for rape is not "grossly disproportionate" to the crime, given the great deference that the legislature is entitled to receive. *Rummel v. Estelle*, 445 U.S. 263, 274, 100 S. Ct. 1133, 1139, 63 L. Ed. 2d 382, 391 (1980); *see Price v. State*, 898 So. 2d 641, 655 (Miss. 2005) (upholding a forty-year sentence for three counts of statutory rape).

While some constitutional principles might be receptive to defendant's plight, the Cruel and Unusual Punishment Clause is not among them. Courts must adhere to the constitutional framework, even when the result is difficult to swallow. Furthermore, we must not forget

that we are not the only guardians of justice in our government. For example, prosecutors must use sound judgment in charging and prosecuting defendants who may be swept up by broad legislative policies that were not likely intended to capture them. The governor, too, is empowered to commute a sentence viewed to be unjust. Finally, consistent with the one true strength of our democracy, the legislature can repair mistakes.

I would affirm the judgment and sentence of the district court and rely upon the other components of government to mete out justice in this case.

Wiggins, J., joins this dissent.